**REISS & WEINSIER, Inc.**

v.

**UNITED STATES.**

**No. 49490.**

United States Court of Claims.

Dec. 1, 1953.

---

David Morgulas, New York City, for plaintiff. M. Carl Levine, Morgulas & Foreman, New York City, were on the briefs.

Carl Eardley, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN, Judges.

WHITAKER, Judge.

In December 1945 the defendant, through the instrumentality of the Housing Authority, embarked on a program to furnish emergency housing for veterans of World War II. The general plan was to demount and separate into their component parts, called panelizing, the housing units constructed for war workers, and to transport them to various locations where there was a shortage of private housing facilities for veterans, and there to erect them as temporary houses for their use. On December 28, 1945, plaintiff entered into such a contract with the defendant, under which the plaintiff was to demount and panelize 1500 housing units "as shall be assigned from time to time by the contracting officer" at various military posts and to transport and to erect them as family dwelling units in various other locations.

Proceed orders were issued for 1049 of these units. The work on 515 of the units was completed. The proceed orders as to 211 of the units were canceled before any work was done. Further work on 205 of the units was canceled after these units had been demounted and panelized. The work on 85 of the units was suspended for a time and then later canceled.

The following table sets out the action taken with respect to each proceed order:

| Purchase order No. | Date of P. O. | Number of units | Demount area | Erection area | Number of units— | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Moved and completed | Demounted, left at site | Canceled before any work done | Suspended before completion | Shipped but not completed |
| 28171–1 | 2/19/46 | 200 | Fort Dupont | Newark | 174 | ........ | 9 | 17 | ........ |
| 28171–3 | 5/21/46 | 212 | Patrick Henry | Newark | 54 | 129 | | 29 | |
| 28194–1 | 6/ 8/46 | 202 | Patrick Henry | Elizabeth | 164 | 8 | | | |
| 28171–4 | 8/ 7/46 | 197 | Marianna Air Base | Newark | 0 | 50 | 147 | | |
| 28213–1 | 8/ 5/46 | 6 | Camp Reynolds | Saddle River | 6 | | | | |
| 28212–1 | 8/ 5/46 | 15 | Camp Reynolds | Tenafly | 15 | | | | |
| 28232–1 | 8/13/46 | 50 | Marianna Air Base | New Brunswick | 32 | | | 15 | 3 |
| 28216–1 | 8/13/46 | 18 | Camp Shanks | Maplewood | 0 | 18 | | | |
| 28231–1 | 8/13/46 | 100 | Camp Shanks | Kearny | 59 | | 55 | 16 | |
| 28231–3 | 10/1/46 | 30 | Patrick Henry | Kearny | | | | | |
| 28217–1 | 8/13/46 | 19 | Swinburne Island | Highland Park | 11 | | | 8 | |
| Totals | ........ | 1,049 | | | 515 | 205 | 211 | 85 | 3 |

Plaintiff's suit is for damages for the failure to issue proceed orders as to the 451 units not covered by proceed orders, and for damages for the cancellation of the proceed orders, which were issued, and for cancellation of further work on some of the uncompleted units, and the suspension of work and final termination of the contract as to others.

Its first cause of action is for the suspension of the work on 85 units prior to completion, and for the final cancella-

tion of plaintiff's contract as to them.

The contract provided that the consideration to be received by the contractor was reimbursement for its costs and a fixed fee plus a fixed overhead.

The principal issue in the case is whether the defendant is liable for damages resulting from suspending operations on the contract and the subsequent cancellation of the contract.

In December 1946 defendant notified plaintiff and other contractors that it might be necessary to stop the program, of which plaintiff's contract was a part, on account of the shortage of funds, until the passage of a deficiency bill by Congress, and then on January 14, 1947, defendant sent the plaintiff the following telegram:

"Pending Readjustment Of Funds Required To Complete Our Temporary Housing Program For Veterans You Are Instructed To Suspend Work Immediately On 15 Dwelling Units NJV–28232–2 New Brunswick; 7 Dwelling Units NJV–28217–1 Highland Park; 16 Dwelling Units NJV–28231–2–3 Kearny; 46 Dwelling Units NJV–28171–7–8–9 Newark. Expect This Suspension Will Be Temporary."

Plaintiff stopped work as directed.

On March 18, 1947, the defendant sent plaintiff another telegram, which reads as follows:

" * * * The Funds Provided For Cost Incurred On Suspended Units Prior To Suspension Take Into Consideration Probable Credits On Subcontracts Which Would Be Effected If No Further Work Was Performed. It Is Not Intended At This Time That You Should Cancel Subcontracts And Effect These Credits. It Is Desired That These Units Be Held In Suspension And Not Canceled Pending The Outcome Of Proposed Legislation To Provide Additional Funds For Their Completion."

And on April 16, 1947, defendant telegraphed plaintiff again as follows:

"Regret Unable Return Your Telephone Call Yesterday. Additional Funds To Your Concern For Veterans Emergency Projects Must Await Passage Deficiency Appropriation Bill. We Have Reason To Believe This Bill Will Be Approved Soon."

On July 29, 1947, Congress passed a deficiency appropriation bill which permitted the Housing Authority to continue with the program. However, prior to its passage defendant decided, and so notified plaintiff and other contractors, that it would not continue with the program on the basis previously contracted for, but would let lump-sum contracts for the completion of the work on a competitive basis. Plaintiff was not interested in bidding on such a contract and declined the defendant's invitation of September 15, 1947, to do so. Accordingly, on October 23, 1947, plaintiff's contract for the 85 units was canceled and a lump-sum contract for the completion of these buildings was let to another company.

Until April 25, 1947, plaintiff was engaged in the completion of other units, work on which was not canceled or suspended, but after that time it did no further work on any of the 1,500 units involved. It alleges, however, that it kept a number of employees on its payroll thereafter and until formal cancellation of its contract as to these 85 units, in anticipation of resumption of work on the uncompleted buildings, and it sues for their salaries and for a portion of its home office overhead.

The suspension of the work on these 85 units was of course a breach of contract, and it was a breach of contract for which defendant is not to be excused, although the reason for the suspension was a shortage of funds. A man cannot be excused from performance of his contract because he runs short of the money necessary to perform it. The other party enters into it on the promise that the money will be paid. If it is not paid, the promise is broken. So it is with the Government. See Jop-

lin v. United States, 89 Ct.Cl. 345, 359–361; Johnson v. City of New York, 191 App.Div. 205, 181 N.Y.S. 137, affirmed 231 N.Y. 564, 132 N.E. 890. Defendant does not seriously dispute this.

Plaintiff is entitled to recover whatever damages it may have suffered by reason of this breach.

Plaintiff says that during the period that the work was in suspension it kept a number of employees on its payroll in anticipation of resumption of the work, and it sues to recover their wages, together with a portion of its home office overhead.

We think defendant's conduct was a sufficient inducement for plaintiff to keep some, if not all, of these employees on its payroll, and that it was justified in doing so. Its initial telegram of January 14, 1947, suspending the work, concluded with this statement: "Expect this suspension will be temporary." Then, about two months later, on March 18, 1947, it wired plaintiff in part:

"* * * It is not intended at this time that you should cancel subcontracts and effect these credits [that is, credits on the subcontracts]. It is desired that these units be held in suspension and not canceled pending the outcome of proposed legislation to provide additional funds for their completion."

Again, a month later, on April 16, 1947, defendant said:

"Additional funds to your concern for Veterans' emergency projects must await passage deficiency appropriation bill. *We have reason to believe this bill will be approved soon.*" [Italics ours.]

In short, defendant held out to plaintiff the hope that at almost any time it would have the money to go ahead with the contract. In view of this, it seems to us that plaintiff could not have been expected to disrupt its organization but was justified in holding it intact pending resumption of the work, which defendant represented would be done as soon as the necessary money could be obtained. We do not think, however, that plaintiff is entitled to reimbursement of its costs for the entire period it claims.

Although the work on these 85 units was suspended, plaintiff was engaged until April 25, 1947, in work on 723 of the units, and the testimony shows that its employees were fully occupied on this work until 515 of these units were completed on April 25, 1947. From that time on plaintiff had no further work to do until work was resumed on the 85 units, except such work as was necessary to wind up the paper work in connection with the units already completed, or on which some work had been done prior to cancellation. The Commissioner has found that about four weeks would have been necessary to wind up this paper work. From this time (May 25, 1947) we think plaintiff is entitled to recover the wages it was required to pay such of its employees as it was justified in retaining on its payroll in anticipation of resumption of work on the 85 units.

For how long thereafter was plaintiff justified in keeping them on its payroll? On September 15, 1947, plaintiff, among others, was invited to submit a lump-sum bid for the completion of the work on these 85 units, but it declined to do so. Later, a contract was let for the completion of them on this basis. Although defendant asked for lump-sum bids for the completion of the work on September 15, it did not formally cancel plaintiff's contract until October 23, 1947. However, Edward O. Roberts, who was the Chief of Construction in the New York Field Office of the Public Housing Administration, testified that he told plaintiff, as well as other contractors, some time prior to the passage of the deficiency appropriation bill on July 29, 1947, that the defendant had decided that it would not complete any uncompleted units on the basis of the contracts already made, but would invite lump-sum bids for their completion.

This testimony is disputed, but we accept it as true, and have so found as a fact.

Mr. Roberts was unable to fix the exact date that he so notified plaintiff and the other contractors, but we assume that this was just shortly prior to the passage of the deficiency appropriation bill on July 29, 1947.

As stated, plaintiff was never willing to complete the work on these 85 units on a lump-sum basis, and so, when defendant notified it that it was going to do so on this basis, it was no longer justified in maintaining employees on its payroll. It no longer had reason to anticipate resumption of work on these 85 units.

■ We conclude, therefore, that plaintiff is entitled to recover the wages of at least some of the employees it maintained on its payroll, in anticipation of resumption of the work on these 85 units, from May 26 to and including July 28, 1947. This is a period of nine weeks. These employees were the construction manager, five accountants, a purchasing agent, and two stenographers. Two of the accountants were on the payroll the entire time, and the others only part time. These accountants had been engaged on the work on all of the units as to which proceed orders had been issued and had not been canceled prior to the beginning of the work, a total of 805 units. Since the work after April 25 had been reduced to a maximum of 85 units, we think it was unreasonable for plaintiff to have kept on its payroll, at the most, more than two of these accountants. We assume that it was probably necessary to keep on the payroll the two stenographers.

The wages of the construction manager, two accountants, and two stenographers, were $600 a week. For nine weeks their wages would be $5,400. This amount we think plaintiff is entitled to recover.

It also claims the right to recover a portion of its home office overhead. However, the Commissioner has found, and in this finding we concur, that there is no basis shown in the proof to definitely allocate this home office overhead between plaintiff's contract with the de-

fendant and whatever other business it may have had. The extent of its other business is not shown by the proof, but it seems to have been confined to only one other contract.

■ Uncertainty as to the amount of damage, however, does not preclude recovery where the fact of damage is clearly established, Story Parchment Co. v. Paterson Parchment Paper Co., 282 U. S. 555, 51 S.Ct. 248, 75 L.Ed. 544, as it is here, if a reasonable basis of computation is afforded, although the result be only approximate, Eastman Kodak Co. v. Southern Photo Material Co., 273 U. S. 359, 47 S.Ct. 400, 71 L.Ed. 684, or if there is a basis for a reasoned conclusion. Palmer v. Connecticut Ry. & Lighting Co., 311 U.S. 544, 61 S.Ct. 379, 85 L.Ed. 336.

■ We think it is not unreasonable to assume that the time of the home office would have been spent about equally on defendant's job and plaintiff's other job. The home office overhead amounted to $629 per week. For nine weeks this amounts to $5,661, one-half of which is $2,830.50. Plaintiff is entitled to recover this amount on account of its home office overhead. It is entitled to recover the total sum of $8,230.50 as damages suffered on account of the suspension of the work.

Had plaintiff been permitted to complete the work on these 85 units after the suspension, it would have been entitled to recover its damages as above stated, and, in addition, it would have been entitled to recover the agreed overhead and the agreed fee on the completed units. However, defendant did not permit plaintiff to complete work on these 85 units, but, instead, let a lump-sum contract for their completion; but defendant had a right to do this under paragraph 13 of the General Conditions. This paragraph reads:

"The Contracting Officer may, at any time, by a written order, * * * direct the omission of portions of the work covered by the contract. Subject to Article 3 of

the contract, if such action causes a material increase or decrease in the amount or character of the work to be done under the contract, an adjustment of the amount of the Contractor's fee shall be made and the contract shall be modified in writing accordingly. * * * "

When further work on the 85 units was canceled, the plaintiff was paid overhead and fee on the basis of the percentage of completion of the work. The contracting officer found that 46 of the units were 61 percent complete, 8 were 84 percent complete, 16 were 66.4 percent complete, and 15 were 82 percent complete, or an average completion for the 85 units of 66.7 percent. This was in accordance with the contract.[1] Plaintiff was paid its overhead in full as it

*Schedule of Prices for Finished Dwelling Unit*

| | Estimated cost | Over-head | Fixed fee | Total |
|---|---|---|---|---|
| * * * * * * Demounting, Moving, Re-erecting and Altering Army Barracks: | | | | |
| 100 Finished Dwelling Units or Less __ | $2,106.00 | $253.00 | $141.00 | $2,500.00 |
| 101 to 500 Finished Dwelling Units or Less _____ | 2,106.00 | 211.00 | 139.00 | 2,456.00 |

* * * * *

---

[1] Article 3(b) of the contract reads in part as follows:

"In consideration of the covenants herein contained the Government agrees to pay the Contractor the total approved cost of performing the work, plus a fixed fee in the amount provided in the Notice to Proceed, plus the fixed amount for overhead expenses as provided in subsection (c) of this Article and Paragraph 6(b) of the General Conditions."

Article 3(c) reads as follows:

"The Contractor agrees that the Contractor's overhead should approximate the amounts of overhead per finished dwelling unit as set forth in Article 3 to the proper category of finished dwelling units assigned the Contractor and agrees to make no claim against the Government or submit any voucher for reimbursement of overhead expenses beyond those amounts per finished dwelling units assigned the Contractor."

Section 6(b) of the General Conditions reads in part as follows:

"*Production Cost*

"* * * none of the following overhead expenditures directly attributable to the performance of the Contract and for which the Contractor agrees as provided in Article 3(c) to furnish for the sum provided in the schedule set forth in Article 3 of the Contract, may be included in production cost:

" 'Clerical help and expenses;

" 'Expediting employees and expenses;

" 'Communication expenses, including postage, telegraph, telephone or by other means;

" 'Traveling expenses;

" 'Cost accounting expenses as required in Paragraph 12 hereof;

" 'All office expenses, including office rent.'

Subject to the above specific exclusions of expenses from production costs, the items for which the Contractor shall be entitled to reimbursement as production cost, shall be as follows: * * * "

For this consideration the contractor was required to do the following work, as set out, in part, in Article I (a) 1–4, (f) and (g) of the contract:

"1. The Contractor shall demount, panelize or alter (at their present or several locations) 1500 dwelling units (subject to subparagraph (f) of this Article) * * * as shall be assigned by Notices to Proceed to the Contractor from time to time by the Contracting Officer, and restore the site from which the houses are demounted to the satisfaction of the Contracting Officer.

"2. The Contractor, if directed by the Contracting Officer, shall proceed with the demounting or the panelizing of units before the new site is ready, and shall safely store such demounted units or

did the work, and in proportion to the percentage completed. This was also true of its fee, less a reduction of 10 percent, which has since been paid it. Apparently, therefore, plaintiff has been paid all it is due under the contract.

## Claim Two

■ After 205 of the units had been demounted and panelized, the contract as to the rest of the work on them was canceled. Plaintiff has been paid its overhead and fee in proportion to the work done. For the reason stated as to the 85 units, this is all that is due it. Since the contracting officer had the right to direct the omission of any portion of the work covered by the contract, he had the right to cancel further work on these 205 units, and since all of the overhead and fee that had been earned has been paid, plaintiff is not entitled to recover on this claim.

## Claim Three

As to 211 of the units proceed orders were issued, but before any work had been done or any expenses had been incurred, the contract was canceled as to them. This, defendant had a right to do, and, since no costs had been incurred, plaintiff is not entitled to recover.

## Claim Four

■ From May 1947 through March 1, 1948, defendant, with plaintiff's permission, stored surplus materials on plaintiff's equipment and material yard. The original contract did not give defendant the right to do this. Defendant has paid all the expenses of the operation of the yard, amounting to $40,702.-19. Plaintiff claims a fee of $5,000 in addition.

The contracting officer allowed plaintiff $1,937.79. The head of the department increased this to $2,400.00, which is 6 percent of the amount of the expenses incurred. The Commissioner has found this to be a reasonable fee, and plaintiff took no exception to the finding. We are not convinced that this fee was unreasonable.

## Claim Five

■ This claim is clearly without merit. It is a claim for insurance which plaintiff was required to take out to protect the person from whom plaintiff had rented equipment. Such insurance was

---

panels on the original site until they can be moved to and erected on new sites.

"3. Transport the panelized houses, community and service buildings to a new site or several sites or building lots in one or several cities or locations.

"4. Prepare foundations and re-erect the dwelling unit buildings, community and service buildings on the new site, sites, or lots including connecting the houses and buildings to utilities furnished by others, * * * all ready for occupancy. * * *

"(f) Notices to Proceed shall be issued as soon as practical and no such Notice shall be issued later than six months from the date hereof without the consent of the Contractor. Termination of the Contractor's right to proceed for the convenience of the Government after issuance of Notice to Proceed shall be subject to Section 27 of the General Conditions except as follows: If no work has been done at the site or sites and no obligations to subcontractors or materialmen incurred the maximum amount payable to the Contractor shall be based on reimbursable costs and shall not in any event exceed including the fixed fee $15.00 per unit for first 100 units, $10.00 per unit for the next 400 units, $7.50 per unit for the next 500 units and $5.00 per unit for all units in excess of 1,000. * * * If Notices to Proceed covering the total number of finished dwelling units stated in article 1(a) 1. is not issued within 6 months, the Government or the Contractor may by written Notice to the other, cancel this Contract as to all Projects for which Notices to Proceed have not been issued and such cancellation shall be without liability on the part of the Government or the Contractor.

"(g) * * * The Contractor shall not proceed with any work in connection with any project until a Notice to Proceed therefor is issued to him by the Contracting Officer and in the expenditures or commitments made by the Contractor in connection with such project prior to Notice to Proceed shall be at his risk. * * * "

not included in the insurance for the premiums on which the contractor was to be reimbursed. As to insurance, other than that specifically mentioned, the contract provided in section 37 of the General Conditions:

" * * * In the event additional insurance coverages are determined to be necessary by the Contractor, detailed information setting forth the reasons and conditions requiring additional coverages must be furnished to the Contracting Officer for consideration and approval before the Contractor shall obtain the same."

The contracting officer's approval of the purchase of this additional insurance was never obtained; and, hence, plaintiff is not entitled to reimbursement therefor.

### Claim Six

This claim is for $4,394.16 for expenses in expediting the procurement of labor. The contract expressly denied reimbursement of such costs. Section 6(b) of the General Conditions provides in part:

"(b) * * * none of the following overhead expenditures directly attributable to the performance of the Contract and for which the Contractor agrees as provided in Article 3(c) to furnish for the sum provided in the schedule set forth in Article 3 of the Contract, may be included in production cost:

"Clerical help and expenses.

"Expediting employees and expenses.

"Communication expenses, including postage, telegraph, telephone or by other means.

"Traveling expenses.

"Cost accounting expenses as required in Paragraph 12 hereof.

"All office expenses, including office rent. * * *"

### Claim Seven

This claim has been withdrawn.

On the whole case, plaintiff is entitled to recover $8,230.50. Judgment for this amount will be entered.

JONES, Chief Judge, and MADDEN and LITTLETON, Judges, concur.