**OLIVER–FINNIE COMPANY**
v.
**UNITED STATES.**
No. 473–53.

United States Court of Claims.
June 8, 1960.

**500**

Donald R. Wellford, Memphis, Tenn., for plaintiff. McCloy, Mayar & Wellford, Memphis, Tenn., were on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Thomas J. Lydon, Washington, D. C., was on the briefs.

LARAMORE, Judge.

This action arises out of a contract between the plaintiff and the Army Quartermaster Corps, involving the assembly of combat rations (hereinafter referred to as C rations) for the Armed Forces during the Korean conflict. Plaintiff seeks damages under alternative theories of breach of contract, or termination of the original written contract giving rise to an implied contract. The defendant has counterclaimed for the value of certain Government-furnished components allegedly lost or damaged by the plaintiff during the performance of the contract in excess of contract tolerances.

After a protracted trial, a commissioner of this court has submitted 171 findings of fact to the court, to which the plaintiff has briefly excepted, and to which the defendant has filed voluminous exceptions. The trial transcript is 2,883 pages long, and there are over 200 ex-

hibits in this case. To discuss each exception in this opinion would require an unwarranted expenditure of time and printing expense. We have, however, carefully considered each exception presented by an exhaustive study of the exception in light of the testimony and exhibits, and we conclude that the trial commissioner's findings are almost fully supported by the evidence. Where an exception was deemed to be well taken, either in whole or in part, the finding was accordingly changed.

On April 26, 1951, plaintiff entered into a contract with the defendant, as of April 4, 1951, whereby it was to receive $347,633 for assembling 4,420,000 C rations, using components and packaging materials, substantially all of which were to be furnished by defendant. The Government entered into independent contracts with various manufacturers and suppliers relative to these components and items. At about the same time plaintiff's contract was awarded, similar contracts, under the same procurement directive, were awarded to some six other firms. In all, 38 million rations were to be assembled under the directive.

The delivery schedule provided for the delivery of 20 percent of the completed rations on or before June 30, 1951, and 20 percent monthly thereafter, to and including October 1951.

The Government-furnished property (hereinafter referred to as GFP) was scheduled for delivery to the contractor's plant at 12½ percent on or before May 20, 1951, and 12½ percent semimonthly thereafter until September 5, 1951. By June 5, 1951, almost one-third of all components required for assembly under plaintiff's contract had been shipped to plaintiff by the Government suppliers.

On June 5, 1951, the contracting officer, pursuant to instructions from Washington, sent plaintiff the following "stop-order."

"Request that no action be taken to begin final assembly until further notice. Sub-assemblies can be started when you desire."

On June 15, 1951, plaintiff was advised that the tentative earliest starting date for final assembly would be July 16. On July 9, plaintiff was authorized to commence final assembly on July 16.

On July 10, 1951, the plaintiff wrote the contracting officer giving notice of a claim for adjustment and advising that such claim would be submitted as soon as costs were ascertainable. No price adjustment was agreed upon during the performance of the work.

On January 7, 1952, prior to the completion of the C ration assembly, the plaintiff submitted to the contracting officer a claim for $144,233.30 as increased costs resulting from the delay of 56 days by the stop-order, and the defective components furnished by the Government. On April 25, 1952, plaintiff submitted its revised claim for $448,270.01 with detailed schedules covering excess costs claimed.

On July 20, 1953, plaintiff filed its petition in this court. Eleven days later, the successor contracting officer issued his findings of fact, and thereafter plaintiff filed a perfunctory appeal to the Secretary of the Army, but took no action on this appeal.

A more detailed account of the facts relative to each facet of the case will appear in context. The questions presented in the case are: (1) Whether the stop order of June 5, 1951, was justified under the circumstances; (2) Whether the stop-order was a termination in whole or in part of the contract, or whether it constituted a breach of the original contract; (3) If plaintiff is entitled to recover, should recovery be based on its theory of termination and implied contract, or on its theory of breach of contract; (4) Whether the plaintiff has failed to exhaust its administrative remedies; (5) Whether plaintiff is liable to defendant on the counterclaims; (6) Whether the decision of the Armed Services Board of Contract Appeals on the infestation claim is supported by substantial evidence, and whether the evidence adduced at the trial *de novo* here substantially supports that determination; (7) If plaintiff is entitled to recover, in what amount and on which items should recovery be granted.

 It is clear, and the defendant admits as much at page 11 of its brief, that if the stop-order was unjustified, it was a breach of the contract and plaintiff is entitled to such damages as flowed from it.

The procurement directive pursuant to which plaintiff's contract was let, was issued on February 13, 1951. The contract was dated April 26, 1951, and entered into as of April 4, 1951.

The first delivery was to be made by the plaintiff on or before June 30. The delivery of components began to arrive at plaintiff's plant by the end of April 1951. By June 5, 1951, almost one-third of all components required for assembly under plaintiff's contract had been shipped by suppliers under contracts with the Chicago Depot Quartermaster's Purchasing Division. By this date, substantial shipments (38 percent of the overall meat components) had been made for 10 of the 11 items of canned meat components specified in the contract. The only meat component that had not been shipped was hamburgers and gravy. The first shipment of this item was made July 16, and was not received until July 25.

On June 2, 1951, the following telegram was sent from the Office of the Quartermaster Corps in Washington to the Chicago Quartermaster Depot, through which the contract in question had been let:

"Confirming instructions given this date to Colonel Hirschhorn and Captain Brines. Due to difficulties in procurement of canned meats and the inability of this office to effect an immediate solution for the supply thereof, it is desired that you take immediate action to reset the assembly program for operational rations so as to begin on or about 16 July. The date to be variable as found best suited to the supply of components. If adequate arrange-

ments can be concluded in the near future for the supply of operational meats you will be advised according-ly. Colonel Hirschhorn has been furnished with data regarding supply position of the QMC with regard to operational rations. Purpose of furnishing this data is to assure you that at present ample supplies are on hand to meet commitments for the immediate future. General Feldman and Colonel Hollis have approved the above plan."

The stop-order was issued pursuant to the above telegram. There was, in fact, no shortage of slaughter cattle during the period of plaintiff's contract. The Army did not procure any of the meat for canners who were supplying the canned meat components for plaintiff's contract.

The situation described in the telegram of June 2, 1951, to the Quartermaster Depot in Chicago had prevailed since January 1951, and was particularly apparent by February and March 1951, before the award of plaintiff's assembly contract.

The Office of Price Stabilization (OPS) had established a freeze of prices for each establishment engaged in meat production in December 1950, and about April 1951 established ceiling prices in all categories. The packers, and the boners with whom canning contractors had placed orders for their meat supply, were under a price squeeze between the cost of livestock and the OPS ceiling prices. While cattle was available for slaughter, little was made available for market because of the price situation.

The commissioner has found, and we think correctly so, that the real reason for the decision to hold up the assembly program was that the pipelines were full.

The defendant contends that in any event, either because of the Army's difficulties with meat or because the pipelines were full, the stop-order was justified under the circumstances. We cannot agree. Had the meat situation not been apparent when the contract was awarded to plaintiff, we might have deemed the stop-order justified, but whether the defendant based its action on the meat situation, or on the fact that the pipelines were full of C rations is of little moment. In either event the determined necessity for the delay stemmed from poor planning on the defendant's part, and we do not think plaintiff should be made to pay for defendant's miscalculations.

When plaintiff was given the green light on July 16, it still had not received any canned hamburgers, although there was some evidence in the record indicating that this component was available. Plaintiff was authorized to commence final assembly with the components that were on hand on June 5. If plaintiff was able to begin final assembly on July 16, substituting other meat components for the hamburger, it could have done the same as early as June 5.

To this defendant replies that the plaintiff was not ready to commence the sub-assembly of B-units until June 22, and the final assembly operations were ready to start about the end of June. However, plaintiff had already received the stop-order, and had no reason to rush its preparations. There is nothing in the record to indicate that plaintiff could not have been ready to start operations earlier.

Plaintiff urges that the stop-order was not only unjustified, but under the Contract Settlement Act of 1944, 58 Stat. 649, 41 U.S.C.A. § 101, it can be treated as a termination. The plaintiff's reason for advancing this theory is obvious. Under the theory of termination and subsequent performance under an implied contract, plaintiff could recover considerably more than it could under the breach theory.

Section 111(b) of the Act provides that:

"(b) Whenever a contracting agency hereafter directs a prime contractor to cease or suspend all or a substantial part of the work under a prime contract, without ter-

:minating the contract, then, unless the contract provides otherwise, (1) the contracting agency shall compensate the contractor for reasonable costs and expenses resulting from such cessation or suspension, and (2) if the cessation or suspension extends for thirty days or more, the contractor may elect to treat it as a termination by delivering written notice of his election so to do to the contracting agency, at any time before the contracting agency directs the prime contractor to resume work under the contract."

■ Plaintiff's termination theory is defeated by the very statutory language it relies on. Section 111(b) allows the contractor to elect to treat a suspension or cessation of 30 days or more as a termination by delivering written notice to the contracting agency, at any time before the contracting agency directs the prime contractor to resume work under the contract. Plaintiff received authorization to start assembly on July 16, by telegram on July 9. The next day, July 10, plaintiff wrote defendant the letter that it claims notified the contracting agency of its election to treat the suspension as a termination. The statute provides for notice at any time before the contractor is directed to resume work, not at any time before the date of resumption.

■ Furthermore, plaintiff went forward with the work specified in the original contract, was paid and accepted payment as per the original contract, and it is now too late for the plaintiff to complain that the stop-order effected a change not authorized by the contract.

Inasmuch as we find that the stop-order was not justified, if plaintiff is to recover, recovery will be based on the theory of breach of contract.

[4] Defendant contends that in any event plaintiff cannot recover because of failure to exhaust its administrative remedies.

Plaintiff's first claim for increased costs was filed on January 7, 1952, prior to the completion of its work. A revised claim was submitted on April 25, 1952. By July 20, 1953, neither the contracting officer nor his successor had issued findings on the claim, and plaintiff filed its petition in this court. Eleven days thereafter, the successor contracting officer issued his findings of fact, and plaintiff filed a perfunctory appeal with the Secretary of the Army, taking no action thereon.

While recognizing that the claim in question was not an easy one to resolve, and that conferences between the parties delayed the ordinary procedure somewhat, we nevertheless think that the defendant took an unreasonable amount of time in issuing its findings. The plaintiff was fully justified in commencing this action when it did, and defendant cannot be heard to complain that the plaintiff should have suspended proceedings in this court and completed the administrative steps, when defendant's own action or lack thereof prompted plaintiff to bypass the normal administrative sequence and commence this suit.

Under its alternative theory of breach of contract, plaintiff claims that its damages are not less than $298,962.43. The excess costs and losses are based on the stop-order, and also on the alleged excessive number of defective components, the handling of which ostensibly increased plaintiff's costs, and the costs of Canova Foods, Inc., a wholly owned subsidiary of plaintiff that performed one of the subassemblies.

The original contract called for the delivery of the completed rations during the months of June through October, 1951, a period of 153 calendar days. Plaintiff's actual delivery was completed January 24, 1952, a period of 238 calendar days from June 1, 1951. The commissioner has found that it is reasonable to conclude that the delay in the final delivery of C rations was attributable to the stop order deferring the final assembly to July 16, 1951, and to the excessive number of defective components which required screening and salvage operations to avoid assembling unsuitable

components. The delay of 85 days in delivery of the completed rations represents 35.71 percent of the total delivery period from June 1, 1951.

■ The nature of most of the excess costs and losses here involved was such that it is impossible to determine with exactitude the damages suffered by the plaintiff. That damages may not be definitely ascertained does not preclude recovery, however, where the fact of damage is clearly established, and a reasonable basis of computation is afforded. Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Reiss & Weinsier, Inc. v. United States, 116 F.Supp. 562, 126 Ct. Cl. 713, 721; Needles, for Use and Benefit of v. United States, 101 Ct.Cl. 535; Penker Construction Co. v. United States, 96 Ct.Cl. 1, 56.

The commissioner has found that a fair and reasonable approximation of plaintiff's increased costs and losses is $194,374.40, broken down as follows:

| | |
|---|---:|
| Storage, switching and other direct costs | $ 36,154.25 |
| Increased direct labor | 78,758.06 |
| Apportionment of other assembly costs | 6,844.51 |
| Apportionment of indirect costs: | |
| Main plant | 41,421.01 |
| Canova Foods, Inc. | 9,739.45 |
| Net loss of the rental value of buildings | 13,217.74 |
| Loss on sale of waste | 4,039.38 |
| Fumigation cost | 4,200.00 |
| Total | 194,374.40 |

While avoiding discussion, as much as possible, of the myriad of facts upon which the commissioner based his determination, we will consider each item of increased cost or loss he has set out.

Outside storage and certain other costs relate wholly to the delay in the assembly and outflow of completed rations, whereas indirect costs are allocable to the period of 85 days of delay represented by the percentage thereof to the entire delivery period.

The plaintiff rented outside warehouses commencing about June 8, 1951, and continuing until December 1951, at an actual cost of $27,051.86.

The plaintiff's payments for switching and demurrage charges in diverting incoming shipments to outside warehouses and transferring such components and materials back to the main plant for assembly amounted to $7,112.02.

The cost of additional packing cases for the temporary storage of B-units assembled prior to July 16, 1951, tarpaulins for outside temporary protection of GFP at the loading docks, extra heating equipment for the assembly room and photos of defective GFP received, amounted to $1,990.37.

These items amount to $36,154.25.

The Government takes the position that a provision of the contract precludes recovery for outside storage, switching, and demurrage charges. The pertinent portion of the contract provision is as follows:

"However, the contractor warrants and agrees that it has available sufficient storage space for the storage of the entire quantity of the Government-Furnished Property (including packaging materials) and will, if required, store and handle the entire quantity of said Government-Furnished Property at no cost to the Government irrespective of this Schedule, during the entire life of the contract and for an additional *ninety (90) days* thereafter."

■ Absent the stop-order and excessive number of defective components, we would agree with defendant's position. On the facts before us, however, we do not think the proviso is a defense. The stop-order, which we have held is a breach of contract, gave rise to the necessity for storing many more components at one time than the parties could have contemplated when they entered into the contract. The normal expectation was for plaintiff to start assembling the components upon or shortly after receipt, and to ship the rations when completed. As it turned out, plaintiff had to receive and store the components for a considerable period of time before it was allowed to begin its assembly work. Then too, it cannot be overlooked that prior to the award of the contract, one of defendant's representatives determined that plaintiff had ample space for storage.

■ The commissioner has allowed $198.91, the cost of photos of defective and infested components received, as a proper item of damages. We agree with defendant's contention that this item is not a proper cost item. Since the contracting officer had refused to investigate a situation that plaintiff complained of,

plaintiff obviously had the photos taken with an eye to a future claim or to future litigation.

■ The plaintiff's greatest additional costs were incurred for the direct labor engaged in screening and rehandling of components and packaging materials. Most of this work was performed by employees in the assembly lines, but much of the additional labor cost represented the salaries of warehouse workers and other employees who were specifically assigned to screening and salvage operations of components which were found to contain such a great number of defects that they could not be handled in the lines. The cost for the additional employees would not comprise all of plaintiff's increased costs of such labor, because of the slowdown in the output of the entire assembly lines. An accurate determination of such increased labor costs is not possible of determination.

The commissioner has found that a fair and reasonable determination of such increased costs may be measured by the increase of plaintiff's direct labor costs over its original estimate, as follows:

*Actual direct labor costs:*

| | | |
|---|---:|---:|
| In the main plant assemblies | $244,086.02 | |
| By Canova Foods, Inc. (Accessory bags) | 40,383.19 | $284,469.21 |

*Original estimate of direct labor:*

| | | |
|---|---:|---:|
| 4,617,390 C rations @ $.04525 | 208,936.90 | |
| Less labor applicable to the plastic spoons excluded in 3,225,750 rations | – 3,225.75 | 205,711.15 |
| Increased cost of direct labor | | 78,758.06 |

———◆———

The defendant argues that the plaintiff has magnified the difficulties actually encountered in assembling the rations and in fact contributed to some of them. The defendant also argues that plaintiff's direct labor cost figure, as estimated, was too low.

It is of course within the realm of possibility that both these contentions are correct, but we do not think that the record bears them out.

■ As we said in F. H. McGraw & Company v. United States, 130 F.Supp. 394, 131 Ct.Cl. 501, 511, the method of

proving damages outlined above is by no means satisfactory, because, among other things, it assumes plaintiff's costs were reasonable and that plaintiff was not responsible for any increase in cost, and because it assumes plaintiff's bid was accurately computed which is not always the case, by any means. But, when as here, the contracting officer has not made a finding as to equitable adjustment prior to the suit, where there is nothing in the record to show that plaintiff's bid was too low, and where it has not been proved that plaintiff's costs were unreasonable, or that plaintiff was itself responsible for any increased costs, we have no alternative.

It may well be as plaintiff contends, that absent the stop-order and excessive defects in components, it would have improved on its direct labor estimate.

As we have said above, we view basing damages on the difference between bid estimate and actual costs with trepidation. We see no basis for carrying this even further, as plaintiff contends for, and basing damages on the difference between its "engineered" costs (lower than its bid estimate) and actual costs.

There is one item of direct labor cost that cannot properly be allowed as damages. This was an additional strapping cost.

The plaintiff experienced some difficulty in obtaining production in strapping the packing cases of six completed rations. The contract specifications required that these shipping cases be bound with a flat steel strap for export shipments.

On August 30, 1951, the plaintiff requested a waiver of the specification for steel strapping with permission to use a 16-gauge 70 to 90 psi round wire which could be handled by a semi-automatic strapping machine, in order to speed up production. The contracting officer denied any deviation from the specifications on strapping of the shipping cases.

In order to avoid an accumulation of completed rations, the plaintiff's strapping employees worked one-half hour extra per day and 8 hours on Saturday, for which plaintiff paid premium pay for overtime. From July to December 1951, the plaintiff's strapping employees performed work on 9 Saturdays.

The commissioner has found that the increased cost represented by the premium pay for strappers was only a nominal sum, amounting to less than $300. Since the contracting officer was within his rights in denying the deviation, the defendant is not liable for the additional cost incurred. In the absence of a specific amount for this item, we think it fair to reduce plaintiff's increased cost of direct labor by $300.

Certain plant costs incurred in the assembly of C rations and directly assignable to such costs were proportionately increased by reason of the delay of 85 days in completing the delivery of C rations, which include the following:

| | |
|---|---|
| Depreciation of assembly equipment | $9,200.75 |
| Supplies and line service | 4,293.92 |
| Rental of machines | 2,755.36 |
| Sundry assembly expense | 2,416.90 |
| Pest control | 500.00 |
| **Total** | 19,166.93 |

A reasonable portion attributable to the delay of 85 days is 35.71 percent thereof, or the sum of $6,844.51.

A fair and reasonable portion of the indirect costs at plaintiff's main plant attributable to defendant's delay of 85 days

is 35.71 percent of $115,992.76, or the sum of $41,421.01.

The amount applicable to the Canova Foods, Inc. plant in the assembly of accessory bags is 35.71 percent of $27,273.73 or the sum of $9,739.45.

The plaintiff's main building contained 7 floors with an area of 27,000 square feet on each floor. Five floors of this building, covering 135,000 square feet, were regularly occupied during the performance period for the storage and assembly of C rations. The fair and reasonable rental value of plaintiff's type of building in Memphis, during the period of the C ration assembly, was 40 cents a square foot, or $54,000 per annum for the 5 floors occupied. The average daily rate was $147.95 and the amount applicable to the delay period of 85 days is the sum of $12,575.75.

The plaintiff acquired the Ballard building on June 15, 1951. It was directly across the street from plaintiff's main building and was utilized as convenient storage for GFP until about the end of December 1951, along with other outside storage warehouses. In addition to other outside storage the Ballard building was required for storage of GFP because of the great accumulation of shipments during the period prior to July 16, 1951. Its use was continued until December 1951, because of delay in the assembly operations, resulting from packing of oversized crackers, infested and defective components. The fair and reasonable rental value of the Ballard building for storage purposes was $266.-67 per month, and the plaintiff had paid $135 rent for the first half of June 1951. The rental value for the storage use of this building, from June 15 to December 31, 1951, was $1,733.35.

The fair and reasonable value for the use of the plaintiff's main building for the period of 85 days of delay, and for its Ballard building as additional storage, is the sum of $14,309.10. Since depreciation of $1,091.36 on these buildings has been apportioned to the delay period in arriving at indirect costs, the net loss of the use of these buildings is the sum of $13,217.74.

The contract provided that all packing materials in which GFP was shipped to plaintiff, would vest in the plaintiff, and this material was sold as waste. The market price of this type of waste dropped substantially after October 1951. Plaintiff's final sale of waste was made January 21, 1952. Because of delays attributable to the defendant, the plaintiff sustained a loss on a portion of these materials sold after October 1951, in the amount of $4,039.38.

The plaintiff paid the Orkin Exterminating Company $4,200 for fumigating its entire plant in June 1952, after the building was substantially cleared of all GFP. This cost was necessary because of infested cookies and crackers received as GFP that were stored in the building during 1951.

Plaintiff argues that the total damages determined by the commissioner are inadequate, in that the net result would be as follows:

Amount previously paid ................$360,081.24
Damages determined ................... 194,374.40

Total proposed payments .......... 554,455.64
Less: Total costs of performance ........ 525,931.32

Excess of payments over costs .......... 28,524.32

The $28,524.32 excess over costs, plaintiff contends, would not even reimburse plaintiff for its loss of anticipated profits of $46,173.90. Under either of the alternative theories advanced in its claim, plaintiff thinks its recovery should be at least as follows:

| | |
|---|---:|
| Loss determined by commissioner | $165,850.09 |
| Reasonable profit | 76,575.60 |
| Interest on borrowed capital allocable to ration | 25,959.56 |
| Reasonable rental value of buildings | 30,577.18 |
| Total | 298,962.43 |

In addition plaintiff, under the termination claim, thinks itself entitled to recover reasonable costs of settlement, the undepreciated cost of special equipment purchased for the ration assembly, and interest on the recovery at 2½ percent per annum as provided by law.

■ As to these items, our holding that plaintiff's termination theory is without merit precludes recovery on them.

■ Plaintiff is unquestionably correct when it states that the loss of reasonably anticipated profits is a recoverable item of damages. However, in a suit for breach of contract, plaintiff is not entitled to profit on the amount of its damages. Torres v. United States, 112 F.Supp. 363, 126 Ct.Cl. 76.

At most, the profits to which plaintiff is entitled is $46,173.90. The commissioner has found that a reasonable profit allowance on this contract would be 10 percent. Based on the original contract price of $347,633, this would be $34,763.-30. Because the excess payments over costs is not too far from this, and because there is no way of knowing whether or not plaintiff would have realized the profit it expected had the contract been performed as originally provided, we see no basis for adding an amount to compensate for loss of profits.

Plaintiff takes the position that it is entitled to recover $25,959.56 for interest on borrowed capital allocable to the ration assembly on the same basis as other general administrative expenses. We have found no interest or discount expense is allocable to the ration assembly expense (finding 138). Hence, we need not decide whether such interest would be recoverable.

And lastly, plaintiff claims that the reasonable rental value of its buildings is $30,577.18, and not $13,217.74 as found by the commissioner. This claim is based on the rental value of the buildings for seven months, the entire period of contract performance. The commissioner's finding is based on the determined 85-day delay.

■ It cannot be seriously contended that plaintiff is entitled to recover the reasonable rental value of buildings it used for the purpose of voluntarily performing a contract with the Government when the Government causes a contractor to lose the use of its property by delaying the contract performance, then only is it liable for the damages caused by the delay.

The Government has counterclaimed for the value of GFP allegedly lost or damaged by the plaintiff during performance of the contract. The largest item of the counterclaim is $89,611.10 as the fair market value of cookies and crackers which were found unfit for use in the C rations because of infestation, less $104.02 recovered on sales of a small portion thereof, and an estimated salvage value of $1,029.00 for the remainder.

The infestation of cookies was first discovered and reported by plaintiff's employees on the assembly line for B-units about October 5, 1951. The infestation consisted primarily of the presence of an insect known as the sawtooth beetle or grain beetle. The infestation of crackers was first discovered on the assembly line about November 9, 1951. Immediately upon the discovery of infested cases of these bakery goods the entire lots being assembled were withdrawn, and thereafter a thorough inspection was made of each lot before it was brought to the assembly line.

By September 10, 1951, the entire contract requirements of cookies and crackers had been shipped to the plaintiff by suppliers. By October 5, 1951, when infested cookies were first discovered, the plaintiff had completed 1,952,119 rations or approximately 42 percent of the total number ultimately assembled.

Following the discovery of infestation in these bakery products, the plaintiff inspected all cookies and crackers remaining in storage, under the supervision of Government inspectors. The inspection was conducted on the fourth floor of plaintiff's building. The examination was performed by lots, sample cases being selected at random from the various lots of stored cookie and cracker components and a 100 percent inspection was made of the selected cases. The operation required the opening of each case and the emptying of the contents thereof upon an inspection table, the examination of the contents and cases, and their re-packing.

As a result of this inspection the Depot Veterinary Inspector condemned as unfit for use approximately 366,822 pounds of crackers and 151,293 pounds of cookies, and the plaintiff was furnished "turn-in" slips for its accountability for these items of GFP. Except for approximately 5,175 pounds that were sold locally by the Memphis General Depot as not fit for human consumption, these crackers and cookies were donated and shipped to the Federal Penitentiary at Atlanta during November and December 1951.

Two carloads of replacement cookies shipped to plaintiff by another assembler which had completed its contract were found to be infested when inspected upon arrival, and three carloads of replacement cookies from the Chicago Quartermaster Depot were also partially infested upon arrival at plaintiff's plant.

On October 30, 1951, a board was appointed to investigate and determine the facts involving the insect infestation of the cookies stored in the Oliver-Finnie Company assembly plant. This board consisted on one officer, Maj. William O. Bradley, who arrived at plaintiff's plant about November 8, 1951. His investigation was concluded December 11, 1951, and he found that the infested cookies consisted of 6,567 cases with a total weight of 143,157 pounds which were unfit for ration assembly. This report concluded: "Based upon the evidence presently available, the board is unable to fix responsibility for the insect infestation."

Pending determination of the cause of infestation, the Government withheld $70,000 due to plaintiff on current vouchers. Payments due other contractors were also withheld for the same reason.

A memorandum dated December 13, 1951, by Col. William E. Pheris, Chief of the Procurement Branch, Supply Division of the Office of the Quartermaster General, on the subject of the release of funds, states in part:

"Captain Baker, the contracting officer on subject contracts, recommended that on the basis of the findings made by the investigating officers assigned to investigate weevil infestations under subject contracts, that 'Based upon the evidence presently available, the Board is unable to fix responsibility for the insect infestation' which recommendation was made with respect to each contract, that the funds which were withheld pending such investigation

be released to subject contractors. This recommendation was approved by Colonel Pheris and the funds were ordered released."

About the same time the plaintiff was advised that the amounts due on its current vouchers would be released for payment.

A report of "Survey" dated March 3, 1952, was thereafter issued in respect to the salvage of 151,293 pounds of cookies and 366,822 pounds of crackers that had been furnished as GFP components for assembly by the plaintiff. The findings and recommendations were executed under date of April 2, 1952, by Lt. Col. A. E. Harrell, Lt. Col. John E. Grant, Maj. William B. Anderson, and Legal Officer Phillip H. Kelley. The board recommended that the plaintiff be held liable for the total cost thereof in the sum of $91,105.41, less any amount recovered through salvage operations, and that all others concerned be relieved from any responsibility. The successor contracting officer, Maj. George W. Loer, concurred in the recommendations of the board as "findings of the contracting officer".

The report relied for the quality and condition of the components upon certificates of the Government inspectors at the suppliers' plants, and upon the shipping documents. These documents were attached to the report. They covered 13 carloads and 6 truckloads of crackers and 5 carloads and 4 truckloads of cookies shipped by suppliers during the period May 14 to September 10, 1951.

On July 21, 1952, the contracting officer issued findings of fact in respect to the GFP components of cookies and crackers addressed to the plaintiff, wherein it was found that plaintiff was liable for $89,507.08 for the same, computed as follows:

```
151,293 pounds cookies, with delivery cost of .... $27,728.17
366,822 pounds crackers, with delivery cost of .. 61,882.93
 ─────────
 89,611.10
 Less credit for salvage .................. 104.02
 ─────────
 Total ........................... 89,507.08
```

The plaintiff made timely appeal to the Secretary of the Army from the determination of the contracting officer, and the dispute was heard and considered by the Armed Services Board of Contract Appeals in ASBCA No. 1471.

The board issued its decision November 29, 1954, in which plaintiff's appeal was sustained. The decision stated in conclusion:

"It is unnecessary to determine, and for the purpose of this decision it may be assumed, that the food did not become infested in the bakeries. We believe that the weight of the evidence adduced before the Board adequately establishes that the infestation originated while the cookies and crackers were in transit to the appellant's plant in railroad cars. We find also that the appellant took reasonable precaution to keep its plant and its rented warehouse space free for infestation and that its inspection of the cases of food upon receipt was reasonably careful under the circumstances. Since the infestation originated while the property was in transit off its premises, the appellant, under Article 30(a) of the contract, is not liable for the value of the cookies and crackers."

The defendant contends that the decision of the Board of Contract Appeals is not supported by substantial evidence.

We need not determine whether or not the finding of the Board that the infestation originated while the cookies and crackers were in transit is substantially supported. For the purpose of this counterclaim, the question is whether or not the infestation originated at plaintiff's premises. To the extent that the Board's decision found that the infestation did not originate at either plaintiff's plant or rented warehouses, we find that it was supported by substantial evidence. Likewise, the evidence adduced at the trial *de novo* here supports that finding.

The defendant also claims for offset the sum of $3,225.75, representing the reduction in plaintiff's labor costs by the authorized deletion of plastic spoons from the assembly of some 3,225,750 rations, less the sum of $3,000 previously deducted from vouchers rendered by the plaintiff.

During the period November 15, 1951, to January 14, 1952, the plaintiff assembled 1,391,640 rations with spoons, all of which were shipped to the Alford Refrigerated Warehouse in Dallas, Texas. The remaining 3,225,750 rations were assembled without spoons.

The contracting officer determined that plaintiff's cost figures indicated a cost of $.001 per ration for packing the plastic spoons, and a reduction of $3,000 was made in one of plaintiff's vouchers about the end of January 1952. The plaintiff accepted the reduced payment check under protest, and on February 7, 1952, requested a speedy adjustment of all claims.

No modification of the contract was agreed upon for the deletion of plastic spoons from some 3,225,750 rations assembled by the plaintiff. A fair and reasonable allowance for credit against the contract price is $.001 per ration or the sum of $3,255.75.

This item of the counterclaim can apply only if the plaintiff does not sustain any part of its claim, as the deletion of the spoons merely reduced plaintiff's costs by approximately $3,225.75, which reduced its losses by a corresponding sum.

As the last part of its counterclaim, the Government claims that plaintiff either damaged or lost the following items of GFP in excess of the one-half percent tolerance specified in the contract:

| | *Amounts claimed* |
|---|---:|
| Pears | $ 23.14 |
| Fruit cocktail | 3.30 |
| Starch jelly discs | 109.39 |
| Sugar | 449.10 |
| Milk | 147.26 |
| Crackers | 427.89 |
| Cookies | 135.66 |
| Plastic spoons | 129.80 |
| Lids (B-cans) | 240.29 |
| Laminated foil, kraft, accessory bags | 175.71 |
| Totals | 1,841.54 |
| Add 4 percent (per contract) | 73.67 |
| Totals | 1,915.21 |

The plaintiff concedes responsibility for the first three items. The defendant's property officer concedes that items in the foregoing claim originally charged to plaintiff on a weight basis are not properly charged to the plaintiff on a unit basis. These items include sugar, milk, crackers, cookies and B-can lids. No allowance was made for breakage of oversized crackers and other defective components in packing the same.

Sugar, milk and coffee powder came in small packets of about 1,000 per case. B-can lids were shipped to plaintiff in packages of 1,000 to 1,500. Cookies and crackers were packed in cases and marked on a weight basis. None of these items were actually counted in the determination of the shortage. Consequently, we do not see how plaintiff can be held accountable for them.

The plaintiff was charged with 36,200 accessory bags of which 16,525 were unaccounted for, and 19,675 represented bags damaged in processing. The tolerance allowance was 23,087, and plaintiff was held accountable for 13,113 accessory bags having a value of $175.71. Manufacturers' defects in 177,075 bags were not charged to plaintiff. The plaintiff experienced great difficulty in opening these bags and in the bursting of bags after they were packed. It was not reasonably possible to inspect and set aside all defective bags before attempting to use them, and it is reasonable to conclude that most of the bags damaged in the assembly process were defective and should have been so classified in this accounting. The claim of $175.71 for accessory bags is not a proper charge against plaintiff.

Since plastic spoons were credited to plaintiff in only those rations reported by the plaintiff with no units damaged in processing, the plaintiff is properly charged for the excessive shortage in these units.

The allowable offset against plaintiff for damage to or loss of Government property is the cost of these items, $265.-63, plus four percent as specified in the contract, $10.62; a total of $276.25.

We conclude that the compensable damages flowing from the defendant's breach of contract amount to $193,875.49, broken down as follows:

| | |
|---|---|
| Storage, switching and other direct costs | $ 35,955.34 |
| Increased direct labor | 78,458.06 |
| Apportionment of other assembly costs | 6,844.51 |
| Apportionment of indirect costs: | |
| Main plant | 41,421.01 |
| Canova Foods, Inc. | 9,739.45 |
| Net loss of the rental value of buildings | 13,217.74 |
| Loss on sale of waste | 4,039.38 |
| Fumigation cost | 4,200.00 |
| Total | 193,875.49 |

---

The Government is entitled to recover $276.25 on its third counterclaim, and its first and second counterclaims will be dismissed.

Offsetting the amount found to be due the Government on its counterclaim against the amount of plaintiff's recovery provides for the entry of the judgment in favor of plaintiff in the sum of $193,-599.24.

It is so ordered.

JONES, Chief Judge, LITTLETON, Judge (Retired), and MADDEN, and WHITAKER, Judges, concur.