Per Curiam
: This case was referred to Trial Commissioner Louis Spector with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on July 22, 1971. Exceptions to the commissioner’s opinion, findings of fact and recommended conclusion of law were filed by plaintiff, defendant urged the court to enter judgment in accordance with the commissioner’s report and the case has been submitted to the *906 court on oral argument of counsel and the briefs of the parties. At the oral argument, plaintiff withdrew its exception to finding 111 and limited its claim to the five other categories listed in finding 95.
The court understands the trial commissioner’s report as appraising all the damages properly recoverable by plaintiff for defendant’s breach of the contracts of February 1,1963 and July 22,1963, not as automatically limiting the recovery to the amount contemplated by the July 22nd contract. After careful consideration, and with due regard to the weight to be given a trial commissioner’s findings, the court is unable to say that Commissioner Spector was wrong in his evaluation of the damages and the court places its decision on this paragraph as well as the commissioner’s report.
Since the court agrees with the commissioner’s opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same, together with the foregoing paragraph, as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover $7,260 and judgment is entered for plaintiff in that amount.
OPINION OF COMMISSIONER
Spector, Commissioner: For a better understanding of the facts hereinafter summarized, it is necessary to explain at the outset that this unfortunate lawsuit appears to have resulted from the coming together of a small well-intentioned but unsophisticated contractor, and the TJ.S. Department of Labor at a time when the latter agency was also relatively unsophisticated in public contract procedures and in the general subject matter of the contracts hereafter described. Also lacking was a clear understanding by the parties of what was being procured.
This action for breach of contract has heretofore been the subject of an “Order of the Commissioner on the Issue of Plaintiff’s Entitlement to a Trial” filed May 13, 1969, and affirmed by the court July 3,1969. Thereafter, following pretrial proceedings in the course of which plaintiff’s prayer for relief was increased from $30,000 to $78,000, a trial of the issues was conducted commencing March 31, 1970. The find *907 ings of fact which follow were developed following that trial, and their examination is essential to an understanding of the “Ultimate Findings and Conclusions” and the “Becom-mended Conclusion of Law” appearing at the end thereof.
Based upon a full review of the record, and for the reasons set forth in the aforementioned “Ultimate Findings and Conclusions,” it has been determined that plaintiff is entitled to recover, that the amount of such recovery should be seven thousand two hundred sixty dollars ($7,260), and that judgment should be entered for plaintiff in that amount.
FINDINGS oe Fact
1. This is an action for breach of contract under the Tucker Act (28 U.S.C. § 1491), upon a “claim against the United States founded * * * upon any express or implied contract with the United States * * *.”
2. In its answer defendant interposed an affirmative defense to the effect that the U.S. Department of Labor had “rendered a decision on the matters arising out of the contract” and that it is “final and binding on the Court and the parties.” Alternatively, defendant asserted in its answer that “if and to the extent it should be deemed, for any reason whatsoever, that the aforesaid decision is not final and binding, and/or further evidentiary proceedings are required in this case, defendant avers that such further proceedings must be returned to the proper administrative body for resolution thereof and that in no case can there be de novo proceedings of any kind, or in any manner, in this Court; and that, in the event such administrative proceedings are deemed necessary, proceedings in this Court should be suspended and the matter returned to the administrative agency in order to permit further administrative proceedings to take place.”
3. On January 6, 1969, plaintiff petitioned the court for accelerated consideration of its case because it dated back to a contract or contracts executed in 1963, severe financial strain had ensued, and plaintiff’s Negro leadership had been unable to acquire sufficient financial backing to rehabilitate plaintiff.
4 Following a pretrial conference, it was concluded that counsel would file memoranda and briefs on the threshold *908 issues raised by tlie above-described affirmative defense interposed by defendant. For the purpose of resolving that threshold issue only, it was established that the parties had entered into a so-called “Contractual Agreement,” February 1,1963, hereinafter described in greater detail and referred to as the “February 1 agreement.” It was entered into following passage in late 1962 of the Manpower Development and Training Act, Public Law 87-415,76 Stat. 23, to develop a cooperative on-the-job training program (hereinafter OJT) for the hardcore unemployed. Under the agreement, plaintiff was to be paid “for reasonable and allowable training costs” incurred in the operation of the approved OJT project provided that “requests for payment shall be properly made and supported by the OJT Facility and that such costs are in conformity with the schedule of allowable costs contained hi the OJT Project Plan (s) attached hereto.”
5. The February 1 agreement does not contain the standard “Disputes” article generally found in Government contracts. Nor does it contain the standard clauses entitled “Suspension of Work” or “Termination for Convenience of the Government” found in many Government contracts. It did, however, contain the following paragraph :
III. This agreement may be amended by mutual consent. It may he sus fended or terminated by the OJT Facility upon 30 days notice to the Secretary or by the Secretary for cause if, after notice and opportunity to be heard, including an opportunity to demonstrate compliance and malee restitution, a determination of failure by the OJT Facility to adhere to the requirements of the Act or to the provisions of this agreement shall be made. [Emphasis supplied.]
6. In opposition to the above-described affirmative defense of defendant, plaintiff alleged that in reliance on its February 1 agreement, it mobilized personnel, materials, equipment, and space, organized itself, and disengaged from other business activities. On July 22,1963, the parties, in implementation of the February 1 agreement, entered into a further agreement (hereinafter called the “July 22 contract”) where-under, for the consideration of $7,260 plaintiff was to conduct a specific OJT project for 6 weeks from August 19, 1963 to *909 September 27, 1963. The consideration above-stated was presumably estimated because the July 22 contract lat'er provided that:
Payment will be made in accordance with provisions made in attachments upon receipt by OMAT of a statement indicating a detailed breakdown of the actual expenditures incurred.
7. There is no “Disputes” article in the July 22 contract either, nor does it contain an article entitled “Suspension of Work,” nor any reference to suspension. Furthermore, the July 22 contract does not contain the standard article entitled “Termination for Convenience of the Government” although it does contain a form of termination clause as follows:
5. Termination for Convenience of OMAT. The performance of the work under the contract may be terminated by OMAT in accordance with this clause in whole or from time to time in part, whether or not the Contractor shall have defaulted under the contract. Upon receipt of such notice of termination, the Contractor shall, unless otherwise instructed in said notice, promptly discontinue all work provided for hereunder, cancel all sub-contracts or other arrangements relating thereto and take such other steps as may be appropriate to minimize the incurrence of costs thereafter. The Contractor shall upon request by OMAT prepare such report or reports consolidating the results of its activities up to the effective date of termination as the Government may direct. In the event of such termination an equitable adjustment shall be made by the Government based upon the costs incurred by the Contractor up to the date the termination becomes effective. [Emphasis supplied.]
8. On August 15,1963, 4 days prior to the commencement of performance under the July 22 contract, plaintiff was sent the following telegram:
YOU ARE HEREBY NOTIFIED IN ACCORDANCE WITH SECTION 5 OF CONTRACT NJ-J-5 EXECUTED JULY 22ND 1963, BETWEEN YOURSELF, REPRESENTING WILCO FLOOR SERVICE COMPANY AND FRANK J. NEHER, ASST REGIONAL DIRECTOR BAT REPRESENTING THE UNITED STATES DEPT OF LABOR THAT YOUR CONTRACT IS SUS *910 PENDED AS OF THIS DATE, AUG 15, 1963. UNDEE TEEMS OF SAID CONTEACT YOU AEE NOT TO INCUEE [sic] ANY COSTS NOT AL-EEADY OBLIGATED UP TO THE DATE OF SUSPENSION A EEPEESENTATIYE OF THE DEPT OF LABOE WILL CONTACT YOU. [Emphasis supplied.]
9. In its opposition to the above-described affirmative defense, plaintiff alleged that it had already performed all of the preparatory work required under the February 1 agreement and the July 22 contract.
10. On September 1,1964, .more than 1 year after the above-quoted “suspension,” defendant wrote plaintiff as follows:
* * * On the basis of information reported by the New Jersey Department of Labor and Industry, I find that there is no reasonable expectation of employment for those to be trained under the contract. Pursuant to Section 5 of the contract, therefore, the contract is hereby canceled.
11. Defendant wrote plaintiff on April 12,1965, referring to a prior letter of October 5,1964, and stated:
* * * That letter requested you to submit your itemized bill for allowable costs, if any incurred, to the contract suspension date of August 15,1963, and stated we would be pleased to determine the extent of reimbursable costs. [Emphasis supplied.]
12. After additional correspondence, plaintiff filed an itemized claim in the 'amount of $9,966.16 on February 10, 1966. By contracting officer’s decision dated January 26, 1967, plaintiff was allowed $1,379, and advised of his right to review by the Secretary of Labor’s Board of Contract Appeals.
13. Thereafter, the Secretary convened what plaintiff describes as an “ad hoc, part-time board composed of a member of the staff of the Solicitor of Labor, the office that was responsible for the drawing up of the two agreements presently being litigated, and two non-lawyers. This board had no rules of procedure. At the hearing that followed the board’s appointment, there was the submission of documents; but there were absent any other elements necessary to create an adequate and comprehensive record. There was no real pres *911 entation of witnesses and opportunity for cross-examination; there was no transcript of the proceedings; and what ex parte submissions were considered by the board are not apparent to plaintiff.”
14. The administrative “record” filed with the court in this proceeding consists of nothing but correspondence, memoranda and two affidavits.
15. By decision of the described board, November 13,1967, in the form of recommendations to the Assistant Secretary of Labor for Administration, the board observed that it was “at least surprised by the contention of the Bureau that the person signing the contract, or document if you prefer, dated February 1, 1963, was not authorized to do so, even though this contention is supported by affidavit, dated July 26,1967, of Elliott French, the then Director of On-The-Job Training (OJT) for the Bureau of Apprenticeship and Training (BAT) of the Department of Labor.” The board thereafter concluded as follows:
Assuming, therefore, that the Government and Wilco were in a contractual relationship, an assumption the Board feels is certainly warranted, then the Board must determine what that contractual relationship was and when it began. In this covmeetion me believe appellant's contention (that the February, document is analogous to a letter contract which was formalized by the July document) is the best interpretation of a course of dealing which does not neatly fit into am,y obvious legal category. Accordingly, we believe that the contractor’s claim is best considered as one arising out of the February 1, document. * * * [Emphasis supplied.]
*****
* * * [T]he Contracting Officer was more than generous in the amounts of costs he allowed. In some instances, the Board, if it had to exercise original jurisdiction, would have recommended less than the amounts allowed by the Contracting Officer. The Board, however, assumed that it was not authorized to reduce the amounts already allowed by the Contracting Officer. Under the circumstances, the Board recommends that the Contracting Officer’s determination be upheld and the Contractor be paid the total amount of one thousand three hundred and seventy nine dollars ($1,379.00).
*912 16. The foregoing recommendations of the board were adopted by the Assistant Secretary for Administration in a letter of December 4,1967, reading as follows:
After an extensive review of the Board’s recommendations, I concur with those recommendations..
While I know, of course, that it is of little solace, please accept for yourself and communicate to your client my regret for the inconvenience caused you and your client by the many delays on the part of the Department in handling Wileo’s appeal.
17. Suit followed in this court for breach of contract seeking damages in the amount of $30,000.
18. On the basis of the foregoing preliminary facts, this commissioner, by order of May 13, 1969, rejected the above-described affirmative defense there being no “Disputes” clause in either the February 1 agreement or the July 22 contract. The order observed that the prior proceedings in the Department of Labor had no statutory basis and depended exclusively “on an agreement between the parties investing one of them with authority to consider and decide disputes between itself and the other party.” Other arguments of the parties and legal authorities are discussed at length in said order which was confirmed by the court July 3,1969.
19. Thereafter, following pretrial proceedings, in the course of which plaintiff’s prayer for relief was increased to $78,000, a trial of the issues was conducted commencing March 31, 1970. The findings of fact which follow were developed as a result of that trial.
20. Plaintiff, Wilco Floor Service, Inc. (hereinafter Wilco), is a corporation organized under the laws of the State of New Jersey since 1962. At all times material herein, its officers were Mrs. Vera Williams, President; Mr. Charles G. Williams (her son), Vice President; Miss Barbara J. Wright, Secretary-Treasurer; and those three officers have owned all the capital stock of plaintiff corporation.
21. Mr. Charles W. Williams (Mrs. Williams’ husband), hereinafter referred to as “Mr. Williams,” has never been an officer or a stockholder of plaintiff corporation. He described his relationship to Wilco as that of an independent consultant who worked for Wilco on a contractual basis. From 1962 until *913 late 1964, Mr. Williams was employed, by tbe Hess Oil Company of Perth Amboy, New Jersey. In 1965 and 1966, he worked for the Solarine Company. Mr. Williams was the prime mover in securing for plaintiff the award of the “on-the-job training” contract (s) which are the subject matter of this litigation. He was the principal spokesman for plaintiff in developing the training program, and in dealing with others with respect to its development. There is no doubt that Mr. Williams is highly knowledgeable in the field of building maintenance. As earlier mentioned, plaintiff’s leadership is exclusively Negro, and the agreements herein described were primarily intended to benefit the Negro, hardcore unemployed.
22. Plaintiff corporation was engaged in the business off commercial cleaning of floors and draperies during 1962. In 1962 and 1963, Wilco had but three or four employees, and one of these was Miss Wright, who performed secretarial duties rather than cleaning work. Some of the other employees worked only part-time.
23. In late 1962, Wilco was located in a rented house in Willingboro, New Jersey. (Willingboro was for a few years known as Levittown, but its name has since been changed back to Willingboro.) At that time Wilco had very little in the way of equipment, namely, a few mops, a few buckets, and a couple of waxing machines, and it carried on only “a limited amount of business.”
24. In 1962, the U.S. Government officially recognized that a determined effort was required to assist people in finding employment by training them in various skills. The aforementioned Manpower Development and Training Act of 1982 (P.L. 87-415, 76 Stat. 23, 42 U.S.C. §2571, et seq.), hereinafter referred to as “the Act,” was passed to assist in solving the problem of “persistent unemployment.”
25. The Act established, in general, two kinds of training programs. One was “on-the-job training” (OJT), which was the responsibility of the Bureau of Apprenticeship and Training in the U.S. Department of Labor (hereinafter USDL). The other was “institutional” (or classroom-type) training which was, in the first instance, the responsibility *914 of the department of education in tlie particular state government involved. Institutional-type training, as contemplated by the Act, meant training for a period of 26 weeks or longer. Under the Act, if the local school system indicated that it did not wish to conduct training in a given field, it was permissible for a private concern to provide such training.
26. In an OJT-type program, an employer who needed workers would train them in his business. The USDL would reimburse the employer for the costs of this training (agreed upon in advance). Thus the employer received no monetary “profit” from an OJT contract as such, but rather trained employees, whose training was paid for by the Government.
27. Section 202(d) of the Act (now codified as 42 U.S.C. § 2582 (f) ), provides that :
Before selecting a person for training * * * the Secretary shall determine that there is a reasonable expectation of employment in the occupation for which the person is to be trained. If such employment is not available in the area in which the person resides, the Secretary shall obtain reasonable assurance of such person’s willingness to accept employment outside his area of residence.
Section 206(a) of the Act (now codified as 42 U.S.C. § 2586 (a)), provides that:
The Secretary of Labor is authorized to enter into an agreement with each State, or with the appropriate agency of each State, pursuant to which the Secretary of Labor may, for the purpose of carrying out his functions and duties under this subchapter, utilize the services of the appropriate State agency * * *.
28. Pursuant to section 206 (a) of the Act, the Secretary of Labor, on August 24,1962, delegated to the New Jersey Employment Security Agency the performance of all the duties and functions undertaken under the Act “in behalf of the State and as agent of the Secretary * * One such duty was the determination of need in the relevant labor market for each proposed OJT program.
29. In late 1962, a Mr. John Hunt was an employee of the USDL, based in Trenton, New Jersey. His position title was *915 “Apprenticeship Training Representative.” Sometime in late 1962 (probably November), pursuant to a request from the local Congressman, be contacted Mr. Williams with reference to a Manpower Development Training Program. At that time, the Manpower Development Training Program was but a few months old. Mr. Hunt explained to Mr. Williams the two kinds of training available under the Act, i.e., OJT and institutional, as above-described, and Mr. Williams expressed interest in conducting an OJT program at Wilco.
39. Over the course of the next few months, Mr. Williams had many discussions with Mr. Hunt concerning the need for a 'broad program generally encompassing “building maintenance.” Mr. Williams emphasized that “a building maintenance course embodies so much more than just the porter course. And this field in which we were going to work of a hard core, we had to change the word ‘porter’ to building maintenance so we could develop a better image and embody more work, such as more fields in the training of people so they could be — learn to be supervisors and not just floor washers or floor waxers.”
31. Mr. Williams discussed and desired a broad program of skills for the Wilco program, and not a particular occupational skill which might become rapidly outmoded. He envisioned a training program where the techniques of one skill could be related to a skill in another field, so that the training time would not be wasted if the need for the first skill disappeared.
32. In the above-described discussions, Mr. Hunt was aware that the program to be developed by plaintiff was geared for “drop-outs,” for people with a low intellectual level and for people who had no prior employment “track history.” Mr. Hunt was not knowledgeable in the field of building maintenance, and had no prior experience with the development of an OJT program. As a matter of fact, the U.S. Government had no prior experience in administering the program proposed under the aforementioned statute.
33. There was then no other program in the United States of the type which Wilco and Mr. Williams discussed with Mr. Hunt. The Department of Labor had no guidelines whatsoever for training in the building maintenance field proposed. *916 This is evidenced by the fact that Mr. Hunt brought the only material the Labor Department had in this occupational area to Mr. Williams, a manual dated June 1948, headed “Department of the Army Technical Manual TM 5-609,” and further entitled “Custodial Services, Repairs and Utilities.” Mr. Williams refused to utilize this 1948 course content in his program, and insisted that the Government leave the development of a building maintenance program entirely to Wilco.
34. In January 1963, Mr. Williams received word from Mr. Hunt that the Government did not know in what category to place this building maintenance course because the Government had not theretofore developed such a course. It is apparent that Mr. Hunt understood and approved the broad-type program Mr. Williams proposed on behalf 'of Wilco. In January 1963, he wrote a two-page document to his superiors bearing the heading “Subject: Building Maintenance Course under MDTA-0 JT,” which reads in part:
In my opinion, the Building Maintenance Course such as proposed here and designated for sis (6) weeks training under MDTA-0 JT, can be of significant help to the unemployment roles [sic] in Burlington, New Jersey area.
A great deal of time during this six (6) weeks will be spent on the knowledge of various articles to be cleaned and the type of make-up; cleaners, detergents and equipment. The theory pertaining to the sanitation field will be well embodied throughout the entire course of instruction. I feel that this course can develop a sense of leadership and pride in the field of custodial maintenance. Trainees will be made to realize that a capable employee in this field must have reasonable degree of pride in one’s self and work, not in just knowledge and use of equipment. This course could very well tend to lean towards leadership in this field. In general, I feel the type of program herewith submitted when completed, will enable an individual to be gualified employees as a floor waxer, floor sander, rug and upholstery cleaners. * * * [Emphasis supplied.]
35. In late December 1962, and January 1963, Mr. Williams awaited some approval from Washington that the necessary basic material and ingredients for a program were present in his proposal, so that Wilco could proceed with its develop *917 ment. Mr. Williams did not want to proceed too far with development of a program, and then have it turned down.
36. The official procedure in the USDL at that time for recommendation of an OJT program was the one followed by Mr. Hunt, as hereinafter described. The local field representative of the Bureau of Apprenticeship and Training would submit a proposed document, give a narrative as to why he thought this type of program should be initiated, and state that he concurred in submission of the proposal. The Wilco proposal, accordingly, was forwarded to the New York regional office, and then to Washington to the USDL division of OJT. A review of the proposal was made by the officials in Washington. Ordinarily the reviewing officials would make certain recommendations about the submitted program, and then send it back.
37. On February 1, 1963, the Government representative, Mr. Hunt, and Wilco’s representative, Mr. Williams, executed a USDL Form OJT-2, entitled “Training Agreement Form CONTRACTUAL AGREEMENT between On-the-job Training Facility and the Secretary of Labor of the United States” together with an eight-page attachment, USDL Form O JT-3. (Emphasis supplied.) This is the February 1 agreement heretofore mentioned. The attachment set forth a proposed on-the-job training program at Wilco. Twelve trainees were to be given a 6-week training course of 40 hours per week. Three of the trainees were to be retained by Wilco.
38. The USDL Form OJT-2 “CONTRACTUAL AGREEMENT” is a two-page document. (Emphasis supplied.) The form, signed by both Mr. Hunt and Mr. Williams, was complete except for two blanks on the first page of the OJT-2 form for the contract number and the project number. The signed USDL Form OJT-2 contained the following pertinent provisions:
II. In consideration for the performance of the training as specified in the attached OJT Project plan(s) and the further above stipulation by the OJT Facility, the Secretary [of Labor] will:
A. Pay the facility for reasonable and allowable *918 training costs incurred in the operation of approved OJT projects, providing that requests for payment shall he properly made and supported by the OJT Facility and that such costs are in conformity with the schedule of allowable costs contained in the OJT Project Plan(s) attached hereto.
* St * * *
O. Refer eligible and available trainees to meet the requirements of the OJT Project Plan(s).
39. Both Mr. Williams and Mr. Hunt signed their names as “Authorized Representative” of the respective parties. On its face, USDL Form OJT-2, “CONTRACTUAL AGREEMENT,” did not indicate that any further approval was contemplated nor necessary.
40. The eight-page attachment, USDL Form OJT-3, is headed “APPLICATION FOR ON-THE-JOB TRAINING UNDER THE MANPOWER DEVELOPMENT AND TRAINING ACT.” Paragraph 3 of the Form OJT-3 is entitled “Estimated MDTA share of project costs— summary.” In this paragraph is set forth the proposed cost to Wilco as $605 per trainee, and $7,260 total for 12 trainees. Other blanks for potential cost items listed in paragraph 3, were left blank. The spaces for project number and agreement number were left blank, as on the first page. Form OJT-3 contained an outline of the proposed Wilco training course, a list of equipment and materials necessary for a building maintenance training course, and a breakdown of the total estimated cost of the training project ($7,260). On the USDL Form OJT-3 attached to the Wilco “CONTRACTUAL AGREEMENT,” the space marked “Occupation,” is filled in as “Bldg. Maint. (Custodial) Porter I.”
41. Mr. Williams signed the USDL Form OJT-3 as “Authorized Facility Representative.” Mr. Hunt signed as “BAT [Bureau of Apprenticeship and Training] Representative.” Spaces for the signatures of the state Burean of Employment Security Agency Administrator, and the Bureau of Employment Security Representative were blank. On February 20,1963, the New Jersey Employment Security Agency certified that there was a need for 12 workers in the *919 building maintenance field, in the Camden-Willingboro labor market.
42. Mr. Hunt, a field representative of BAT, did not officially have contracting authority to enter into an on-the-job training program project under existing I7SDL procedure, although plaintiff was not aware of this. Nevertheless, from the time Mr. Hunt signed the February 1, 1963 document above-described until the hearing on appeal of plaintiff’s claim before the ad hoc board of the Labor Department in 1967, no one in the Labor Department ever told Mr. Hunt he was not authorized to sign, nor that his signature was improper, nor did anyone attempt to repudiate the “CONTRACTUAL AGREEMENT” of February 1, 1963. Mr. Frank Neher was, during 1962 and 1963, Assistant Regional Director of the Department of Labor and the person to whom Mr. Hunt was required to report his activities.
43. After reading and signing the aforementioned documents on February 1, 1963, Mr. Williams “felt that this authorized us to move ahead as fast as we could to get formalized to start a program.” Certain preparatory work was required to be done. Mr. Williams felt that the February 1, 1963 documents, above-described, outlined what was tentatively necessary for such a program, and that Wilco met the preliminary requirements. His testimony continues:
From then on I called in some of the individuals, we started making and submitting to him [Hunt] and by letter various areas of Which we were to proceed. We rented space, started renovating an area at the Willings-boro [sic] Shopping Center, started gathering material to formulate what would be the procedures necessary to be used in the proposal that had been signed.
44. Soon after February 1, 1963, Wilco moved to offices in the Tower Shopping Center in Willingboro. The Tower Shopping Center is a small shopping center comprised of four stores. Wilco moved into a portion of the basement of the shopping center. Its space was partitioned into two areas, an office and a training room. The distinguishing feature of the training area was that its floor was of various materials, to enable trainees to receive training on cleaning methods.
45. Wilco entered into a 2-year lease for the Tower Shop *920 ping Center space above-described. Mr. Williams felt that the statements made by Mr. Hunt warranted Wilco’s entering into a long-term lease. Mr. Williams knew the training program, described in the above-mentioned “CONTBAC-TUAL AGBEEMENT,” was scheduled for only 6 weeks, but had the impression the program would continue in a series of such sessions for at least 2 years, if successful. Mr. Williams testified that Mr. Hunt assured him the program would feature continuing 6-week sessions over a period of 2 years. Mr. Hunt, however, denies giving such assurance at any time. Mr. Hunt testified that his discussion with Mr. Williams concerned a “contract [which] was to run for six weeks, and that if at the completion of the six weeks the people trained were employed, the possibility would be that we would resubmit for another contract.”
46. Immediately following the signing of the above-described February 1 'agreement, plaintiff began the detailed preparation of the course, and course materials. In addition, plaintiff made renovations in its space at the shopping center in Willingboro. It added another area, expanded the facility, and installed a lavatory. The additional area added $45 per month to the $25 per month rent Wilco had agreed to pay originally. Mr. Hunt examined the new facility.
47. Plaintiff sent out 40 or 50 letters to area concerns to determine their interest in hiring trainees produced by such a program. Mr. Hunt also sent out inquiries. The response was generally favorable.
48. After signing the agreement of February 1,190,3, Mr. Williams started talking to individuals who would staff the program. While Mr. Williams testified that he had agreements with certain individuals to be instructors in a particular area of the building maintenance field, there is no evidence offered by plaintiff to show that these individuals did in fact perform any work for Wilco on the program. Plaintiff did utilize the services of Mr. Williams, Mrs. Yera Williams, Miss Barbara Wright, and a Mr. Charles Freeman for the purpose of making preparations for the training program. All but Mr. Freeman were already employees or affiliates of Wilco, as earlier mentioned.
*921 49. After signing the February 1 agreement, plaintiff bought equipment and materials necessary for instructing the trainees, including detergents, acrylics, floor sanding equipment, waxers, “johnny-sweepers,” spray machines, and exterminating machines. Plaintiff acquired these materials and equipment because it believed they were necessary to demonstrate to defendant’s representatives that Wilco had the required materials to perform its contract. Mr. Williams testified these materials were inspected by Mr. Hunt and his superior, Mr. Stevens, after Wilco had been notified to have all equipment to be used in the program available for inspection.
50. The February 1 agreement provided only for rental of equipment. Mrs. Williams testified that Wilco instead spent $2,200 to buy supplies and machines necessary to implement the program, funds which Wilco borrowed from a bank and from Mrs. Williams’ pension fund. When informed that the OJT program would cover only the cost of rental of equipment, Mr. Williams testified that “we felt we could carry the bill. Also, we thought we could expand it and expand the program.” Mr. Williams believed the initial payment contemplated by the start-up of the program (25 percent of the total), would allow Wilco to support this expense.
51. The aforementioned Mr. Freeman is a graduate of Penn State Normal School, has a B.S. degree from Trenton State Teachers College, a master’s degree from New York University, is a member of the New York University Society of PM Delta Kappa, and has a doctorate degree from New York University. Mr. Freeman has had wide experience with the mentally retarded and maladjusted, and has been an educator for over 35 years. He has long been active in civic affairs and was for 3 years principal of the adult night school in Trenton. From February 1963 until the end of the summer, he spent a good deal of time arranging interviews and making telephone contacts with individuals. Mr. Freeman participated in preparing a training schedule and material to cover such subjects as the installation of floors, the care of material and equipment, the cleaning of rugs and upholstery, the various dyes used, the various spot removers, the detergents, the washing of walls, and basic knowledge of air conditioning, *922 carpentry and personal conduct and social behavior. Mr. Freeman testified that be spent 204 hours on the Wilco program from February 1963 to August 1963, but his written statement of hours worked seeks compensation for only 50 hours,
52. Mrs. Vera Williams has a bachelor of science degree in elementary education and a permanent certification to teach the mentally handicapped in the State of New Jersey. Mrs. Williams had, at the time of trial, been a teacher in the Trenton, New Jersey, school system for some 16 years, and she is experienced in the methods and psychology of educating those with a mental handicap. Mrs. Williams spent many hours doing preliminary research work in contemplation of the performance of this contract, searching out materials, books, .articles and obtaining and making visual aids.
53. From February 1,1963 through September 1964, Mrs. Williams testified she spent a total of 206 hours on the Wilco program. Apparently 170 of these hours were before the “suspension” of the project (hereinafter described in greater detail), and 36 hours were involved in post-suspension meetings. One hundred of the hours spent by her were on research work, and 70 hours on chart-preparation and planning.
54. The earlier mentioned Miss Barbara J. Wright had been employed by Wilco prior to the February 1 agreement. After February 1,1963, she performed secretarial and administrative work in connection with the training program, primarily typing training material.
55. Mr. Williams, who had overall responsibility for negotiating and developing the training program, had extensive experience in the building maintenance field, and was knowledgeable in the latest techniques, materials, and equipment necessary to train personnel in this field. He testified he spent 130 days in developing the training course, attending conferences with U. S. Labor Department officials, and in attempting to resolve the problems presented by the program during the period February 1, 1963 to the date of suspension (and then termination), as hereinafter described.
56. Mr. Hunt forwarded the documents signed February 1, 1963, through normal channels “for approval.” The Wash *923 ington review office in tlie Department of Dabor, speaking through Mr. Ansel Cleary, the Deputy Administrator of the Bureau of Apprenticeship and Training, felt that the proposed equipment costs, instructor costs, and costs per trainee were too high.
57.A memorandum from the Washington review office dated March 22, 1963, contains the following paragraphs:
It appears to us that the Porter I classification does not describe the job indicated by the training breakdown. A porter does not do floor sanding, edging, etc. For example, a porter or janitor, doing the usual janitor work in a school, hospital or office building does not require six weeks of the diversified training called for in this project. If the Wilco Company has need for three workers of the type indicated by the training breakdown, it will be better to establish a project for this firm alone.
The average cost per trainee is $605. After adding BAT costs and BES costs, the total will be much higher than, can be justified.
Please re-negotiate the costs of this project or, possibly, re-develop one project for Wilco and one for a shorter period for Porter I. [Emphasis supplied.]
58. The above memorandum illustrates the differing concepts of the training program entertained by plaintiff on the one hand, and representatives of defendant in the Washington review office, on the other. The Washington office apparently believed the “course” should be used merely to train porters or janitors, rather than for the more sophisticated purposes planned by Mr. Williams.
59. Mr. Hunt was instructed to attempt renegotiation of the items questioned by the Washington review office. There followed extended discussions about the reasonableness of the proposed costs. These discussions took place between Mr. Hunt and Mr. Williams 'and continued until late May of 1963, when Mr. Hunt temporarily dropped out of the negotiations. The discussions continued by letter between Mr. Williams and the aforementioned Mr. Cleary. Mr. Williams consistently refused to agree to lower costs.
60. A memorandum dated May 14,1963, to Mr. Neil Kort, the Regional Director, from Mr. Joseph R. Stevens, New *924 Jersey State Supervisor, and Mr. Hunt’s superior, illustrates the stalemate in the discussions; and Mr. Williams’ insistence that the program be as he had planned it. Mr. Williams appears justified in his belief that the Washington office had relatively little understanding of building maintenance work. This memorandum also contains the first indication in the record that the Wilco program might be suspended. It re'ads in pertinent part 'as follows:
Ansel K. Cleary, Deputy Administrator, during a telephone discussion with Frank Neher, requested up-to-date information re: Wilco Floor Service, O JT proposal.
To begin with, I am enclosing copies of John J. Hunt’s reply to Ansel’s memo dated April 25, 1963, and will supplement with my own conclusions as follows.
I accompanied John Hunt, as stated in the memo, to assist wherever and however I could with renegotiating certain costs in the OJT-3 proposals as recommended by D.P.D.
Mr. Williams’ attitude was anything but receptive. He is not a listener, at least, not that day. As a member of the minority race, he felt that his proposal to train Custodial Workers was an excellent opportunity to provide training for members of his race in an occupation that offered a chance for continuous employment. By his own words, he wanted this opportunity to be a part of a program that offered opportunity to his people. I do not quarrel with his ambitions and admire his philosophy.
He was particularly incensed with the Washington office lack of u/nderstanding of the work accomplished in this occupation, and their questioning the need for ■floor edgers and sanders, as well as the costs of industrial type clemxers a/nd equipment. Added to this, the time he spent preparing the training proposals, phone calls, related, e£<?., he felt that someone ought to pay him for this. Me is determined to obtain the training — his way. [Emphasis supplied.]
Mr. Williams definitely has his mind made up and was completely unwilling to discuss a reasonable solution to the questions posed. As a result, it was concluded, by myself and Mr. Hunt, that if Vocational Education will undertake the training, it will result in far quicker action, as they can, and will, undertake to approve the costs that are impossible under OJT. It is presently *925 being considered for Institutional Training by tbe New Jersey Division of Vocational Education.
Mr. Williams may object to this as be will not bave tbe opportunity to “operate” tbe program under bis direct guidance.
I would like to commend John Hunt for bis excellent manner of handling tbe program from tbe very beginning to this date. He Has done everything possible within tbe scope of a field man to get tbe program operative.
I do not feel that Mr. Williams’ cooperation has been what it could bave been in reference to negotiating tbe costs to an agreeable conclusion for acceptance under OJT. Nevertheless, his determination to reach an objective may prove embarrassi/ng to BAT because of our inability, m this instance, to provide approval for a small business man, a minority member, the hard-core u/nemployed and a service occupation. [Emphasis supplied.]
We will advise further on whatever developments occur in tbe progress of tbe proposal through Institutional type training.
61. Prior to the February 1 agreement, namely, in late 1962 and early 1963, certain civic leaders in tbe Trenton, New Jersey, area bad contacted Mr. Williams concerning a program to alleviate unemployment for nonwhites. Mr. Walter Hamilton, Educational Director of tbe Carver Branch of tbe YMCA, served as spokesman for these civic leaders. He wanted to know if a program such as Wilco was planning in Burlington County could be brought to tbe Trenton area. The Carver Branch YMCA is located in the heart of tbe Negro ghetto in Trenton. Mr. Williams was a past-president of this YMCA branch.
62. Mr. Hamilton and other civic leaders in Trenton wanted to see Mr. Williams’ program transferred to Trenton because they felt the need for such a program was greater in Trenton than in Burlington County. The Trenton area has a greater population, and a higher unemployment rate among nonwhites than does the Burlington County area.
63. In the latter part of February 1963, Mr. Hamilton discussed the transfer of the Wilco program to the Trenton area with Mr. Arthur Lewis, who acted as a liaison between the New Jersey Employment Service and the Federal Gov *926 ernment. He also discussed the transfer with a Mr. Srhenke, an official of the Labor Department for that state. Mr. Hamilton learned that in order to get the program transferred, he had to obtain the approval of a Dr. Seymour Wolfbein, the Director of the Office of Manpower, Automation and Training of the USDL.
64. On July 1, 1963, Dr. Wolfbein, in response to Mr. Hamilton^ invitation, visited the Carver YMCA where he sipoke with both Mr. Hamilton and Mr. Williams. Dr. Wolf-bein examined .the proposed facilities, checked equipment and supply rates in the Trenton area and scrutinized wage scales for the Trenton labor market. Dr. Wolfbein thereafter recommended transfer of the Wilco program to Trenton; and further that the Wilco program “be approved as it stands in terms of cost and course design.”
65. On July 8,1963, Dr. Wolfbein wrote a “Memorandum for the Under Secretary” which is hereinafter fully set forth because it illustrates Dr. Wolfbein’s satisfaction with the Wilco program, and its proposed costs. It also shows that Dr. Wolfbein at least comprehended the planned building maintenance course as more than a porter course. The memorandum reads as follows:
A training program for building maintenance workers •in the Trenton, New Jersey area, which has been under consideration for about half a year, has been referred to this Office for review and recommendation.
I visited the area, spoke to Mr. Charles Williams and Mr. Walter Hamilton (the principals involved), saw the proposed training site, priced the relevant equipment and supplies in the area, checked ongoing wage and salary rates in the labor market, and found the following:
1. The overriding factor in this case is the proposed training of Negroes in a neighborhood of extremely poor socio-economic conditions, highlighted by high rates and duration of unemployment, substantial numbers on welfare rolls, and very low levels of educational attainment.
2. The Bureau of Apprenticeship and Training has correctly raised some important questions regarding the proposed training program and has used good judgment in pursuing these matters. There is, however, a substantial amount of concern *927 about the length, of time involved in getting a decision, which has resulted in a negative attitude about training and retraining — especially on the part of the Negro community. Good placement prospects for those trained home been documented. [Emphasis supplied.]
3. The major issues and findings are as follows:
a. Costs of instruction, at $5.00 per hour, are considered by the BAT to be too high.
Finding: When measured against the prevailing rates for foremen in this area, for this trade ($1.75 to $1.95 per hour), and allowing for some additional premium for overall instruction, a rate of $5.00 appears to be on_the high side. However, consideration must be given to the fact that the trainees will be disadvantaged Negroes, particularly with low educational attainment, and instruction will involve more than the standard performance required of a teacher. This is a breakthrough program and the $5.00 an hour should be permitted— especially since it will only be for a concentrated period of six weeks. The quality of instruction will be the critical force in this training program.
b. A secretary is requested for the program, at a cost of $300 for the six-week period and is considered unnecessary by the BAT.
Fmdmg: The term “secretary” may be a misnomer. Whatever the person is called, he or she will have to maintain all cost records (including those which will be audited by us), performance records of the men, etc. etc. This should be allowed and is a worthwhile expenditure of a small amount of money.
c. Bental and material costs for the program are considered excessive by the BAT.
Finding: My own telephone survey of prices and rental costs (sanders, polishers, vacuum cleaners, etc.) supports the estimates given by those who will be conducting the program. They should be permitted to stand, especially since project costs will be audited and only actual training costs will accordingly be paid.
*928 RECOMMENDATION: I recommend, the proposed subject training program for buMdmg maintenance workers be approved as it stands in terms of cost a/nd course design; that the site of training actually be at the Garner YMCA, Ifi Fowler Street, Trenton, New Jersey, in the heart of the Negro community; that the approval be granted this week; that the program be closely audited, especially since it may be the first in a series m this comrrmniiyy. [Emphasis supplied.]
66. At the July 1,1963 meeting at Carver Branch TMCA, Mr. Williams had informed Dr. Wolfbein he could not give up any more time from his other jobs, just for a 6-week trial program, and he asked for a 2-year contract to protect Wilco’s investment of time and money. Mr. Williams testified that Dr. Wolfbein answered that “it was not actually done in this way, but he said when we set up a pilot program — and be rest assured with the amount of money that is involved here— it can run — it will run for two years or longer.” The last clause of Dr. Wolfbein’s memorandum that “it [the program] may be the first in a series in this community[1]'[1] (emphasis supplied), illustrates that the Wilco program was intended as a 6-week pilot program, with the possibility of repeated renewal if successful. The Wolfbein memorandum is, therefore, quite consistent with plaintiff’s understanding of the negotiations and program. There is, however, no evidence in the record to support, and much evidence to controvert, Mr. Williams’ recollections of discussions with Mr. Hunt and Dr. Wolfbein that Wilco was to receive a 2-year contract.
67. Both the Carver Branch of the YMCA and Dr. Wolf-bein were aware of the statutory requirement that there be a need for plaintiff’s program in the Trenton area (see sec. 202(d) of the Act, finding 27). In March and April 1963, Mr. Hamilton of the Carver Branch YMCA sent letters to Trenton area employers inquiring about employment prospects for trainees. The response was generally favorable. Dr. Wolfbein knew of these results because he concluded in his memorandum: “Good placement prospects for those trained have been documented.”
68. On July 19, 1963, his superiors ordered Mr. Hunt to *929 get tiie signatures on the existing “proposal,” and to forward 25 copies to New York. This is an apparent reference to the O JT-3 form annexed to the February 1 agreement previously described. Mr. Hunt was informed that the “proposal” would be approved. He took the “proposal” around that day and obtained the required signatures, one of which was Mr. Williams’, who signed for Wilco on a new covering agreement, as hereinafter described. He learned from Mr. Williams that the actual location of the training would thereafter be changed from the Tower Shopping Center in Willingboro to the Carver YMCA. The document which Mr. Hunt took around for signatures stated that the OJT Facility was Wilco Floor Service Company, that Wilco’s address was Tower Shopping Center, Willingboro Parkway, Levittown, New Jersey, and that the OJT space was “located under Tower Shopping Center, Levittown, New Jersey.”
69. The document above-described, which Mr. Hunt took around for signatures, contains the same employees’ cost per trainee as the February 1 agreement previously described. It also includes as reimbursable costs the New Jersey Employment Security costs (selection and referral, and allowance payment), and a training allowance. These latter costs had not been recited in the February 1 document. The document which Mr. Hunt took around also contained the signatures of the State Employment Security Administrator, and of the Bureau of Employment Security representative. Under the word “Approved,” it contains the signature of Mr. Frank Neher, the contracting officer. This instrument is the July 22 contract earlier described.
70. As previously indicated, this July 22 contract provided for a training program to run 6 weeks from August 19,1963 to September 27, 1963. There were to be 40 hours of instruction per week. Twelve persons were to be trained thereunder, and Wilco agreed to employ three of these after the successful completion of the program.
71. As earlier stated, the July 22, 1963 contract does not contain any type of provision for suspension, as did the February 1 agreement. It does, however, contain the non *930 standard termination for convenience provision earlier set forth.
72. The USDL Form OJT-3, attached to the July 22 contract, had the “occupation” space on the first page filled in as “Building Maintenance (Custodial) Porter I.” However, the page of the' same OJT-3 Form entitled “OJT Project Plan,” showed the “occupation” for the project as “Building Maintenance.”
73. There was a public announcement of the approval of plaintiff’s program by the Governor of New Jersey at a meeting which, in addition to newsmen, had in attendance Mr. Raymond Male, the then Commissioner of Labor of the State of New Jersey, the Reverend Woodson, Assemblyman from Mercer County, as well as plaintiff’s representatives.
74 The site of the OJT program under the July 22 contract was officially changed to the Carver YMCA, Trenton, New Jersey, on July 25, 1963, by a letter from Mr. Frank Neher, the contracting officer, to Mr. Williams. The facilities for the OJT program at Carver consisted of two rooms plus a snack bar, and storage space. The only preparation required for the program was the moving of furniture, no major renovations being necessary. Much of the space earmarked for the OJT program was not used during weekdays in the summer.
75. When the training program was transferred to the Carver YMCA, Mr. Walter Hamilton was employed by plaintiff to perform duties outside his usual YMCA duties. Mr. Hamilton participated in conferences with Dr. Wolf-bein and other officials, interviewed applicants, and visited other institutions with training programs.
76. In a memorandum dated August 5, 1963, Mr. Hunt reported to his superior that Mr. Williams had complied with USDL procedure in requesting an initial payment of 25 percent of the total cost of the program, and that Mr. Williams was pleased with the status of the Wilco program. Mr. Hunt wrote: “We are, in all cases, ready to go with the training program * * Mr. Hunt reported that the “Em *931 ployment Security local Trenton Office lias screened 14 applicants for this training program.”
77. On August 13, 1963, Mr. Neher reported in a memorandum to Mr. Neil Kort, Regional Director, a conversation he had with Mr. Hunt concerning factors affecting the Wilco program, as follows:
He called the Regional office since he was unable to contact Stevens in Newark. He stated that it is rumored that Male [the previously mentioned Commissioner of Labor of the State of New Jersey] objects to the Wilco Floor Service Co. OJT program and will withhold approval. Since the program is approved and referrals will be made so that the program will start on the 19th, I do not see the logic 'in the above statement. However, it would be interesting to find out if our friend, Commissioner Male, really has any objection to this program.
78. If the change of site from Willingboro to Trenton constituted a new “relevant market area” then the New Jersey Bureau of Employment Security had to conduct a survey pursuant to the Act to determine whether there was a need in this new relevant labor market (Trenton) for workers trained in the kinds of work covered by the Wilco on-the-job training program. This agency apparently concluded that there was a need for another survey and it did make such a survey. It determined in a letter of August 13, 1963, that there was no need for such workers in the Trenton area. This determination stated dn pertinent part:
* * * A list of prospective employers, upon whose needs the relocation was presumably based, was contacted by our Trenton Local Office, and little or no apparent need was discovered.
While we have not made a complete survey in the Trenton Area, we are concerned further by the fact that the active file of unemployed job seekers in the custodial service field now numbers over 100. Therefore, it is obvious that if there were any job opportunities discovered, these experienced unemployed workers would have to be utilized before developing a further supply of workers could be justified.
79. As earlier stated, it was on August 15,1963 that plaintiff was notified by telegram addressed to both the Tower *932 Shopping Center and Carver YMCA that its contract was “suspended” and that it was “not to incur costs not already obligated.” It will be recalled that the February 1 agreement contained a provision for “suspension,” but that the July 22 contract did not. This suspension notice came 4 days prior to the scheduled starting date for the Wilco training program.
80. In the months following the suspension, Mr. Williams made considerable efforts to ascertain the reasons underlying it. Plaintiff maintained itself in a state of readiness to perform its contract, and retained the employees hired for the program. During the suspension, Mr. Williams and others of the Wilco staff donated time in the evenings, without compensation, to a church program in Trenton to train individuals. He and his staff desired to keep the interest level in the training program high until the program was reactivated. Mr. Williams had several meetings with USDL officials, but was not told why the program had been suspended. He visited the Urban League in New York for assistance, and spent a day in Washington with members of the staff of New Jersey Senator Clifford Case in this connection.
81. More than a year after the suspension, by letter dated September 1, 1964, Mr. John C. Donovan, Manpower Administrator in the Department of Labor, notified plaintiff that:
* * * On the basis of information reported by the New Jersey Department of Labor and Industry, I find that there is no reasonable expectation of employment for those to be trained under the contract. Pursuant to Section 5 of the contract, therefore, the contract is hereby ecmceled. [Emphasis supplied.]
82. The reasons and motivations imderlying the suspension of plaintiff’s contract, and the continuation of such suspension for such an unreasonable length of time, followed by cancellation, are shown in correspondence and memoranda from files of the defendant. After the July 22 contract was signed, serious allegations about the personal financial responsibility of Mr. Williams, and therefore his capability of conducting a Government-sponsored training program, were *933 brought to the attention of the USDL (by the aforementioned Mr. Raymond Male, Commissioner of Labor and Industry of the State of New Jersey). These allegations concerned:
A. Serious delinquencies involving the failure to transmit workers’ contributions in at least two cases to the New Jersey State Unemployment Insurance Office, totaling $1,700 in principal, interest, and penalties.
B. Seven cases in which Mr. Williams had to be forced to pay employees back wages because he had violated minimum wage provisions of New Jersey.
C. Serious and prolonged difficulties with the U.S. Treasury Department involving corporate and personal income taxes, withholding taxes and social security contributions.
83. Therefore, on August 15, 1963, the decision had been made to suspend the Wilco program. Mr. David E. Christian was the USDL official handling the Wilco program in Washington at that time. In a memorandum dated August 15,1963, he recommended suspension in these words:
The developing information makes it imperative in my estimation that we move immediately to suspend commencement of the subject project pending further inquiry. I suggest that both Bureau’s involved immediately instruct their State and local officials to this effect. In the case of BES, this seems desirable because it appears that further delay in the selection process may be an important means of actually stopping the project. In the case of BAT, I believe a specific message must be transmitted to the program sponsor (the contractor) informing him, of the suspension and directing him to incur no further costs in connection with the project.
Confirming earlier discussions with BAT staff, it is expected that the BAT staff will consult with Mr. Shearer’s office and the Office of the Solicitor in the preparation of the actual wording of the suspension message to be communicated to the contractor.

Mr. North is handling certain 'political aspects of tMs action and should he kept fully informed.

Once a suspension is am, accomplished fact it would appear necessary to conduct further im/oestigation into whether or not the program should he cancelled completely. From information available to me so far it *934 appears that this invol/oes exploration of the contractor’s financial responsibility in the light of prior history known to the State Employment Security organization as well as the question of whether or not proper anticipation of employment exists for the trainees — also a matter for consideration by the Employment Security Agency. In the absence of any alternate views I suggest that BES proceed to obtain more detailed analysis on both of these points from the New Jersey Agency, and that the decision on final cancellation be deferred until such detailed analysis is available to us. [Emphasis supplied.]
Please let me know immediately if there is significant feeling that the procedure outlined above should be changed; in view of the imminence of commencement of the project it seems imperative that the BAT notification of suspension be transmitted yet today if at all possible.
84. In a memorandum dated September 5,1963, Mr. David E. Christian states he is rushing to close the suspended status of the Wilco program and that the only remaining question is political. He States:
I am trying to rush the final closing of this project which is now in suspended status. The only remaining question is how; i.e., what grounds to use and how to make the action most palatable to_ the northern New Jersey community. [Emphasis supplied.]
I will hope to have a specific proposal on this to check with the Under Secretary early next week — it now depends only upon some verification of labor market facts through Mr. Goodwin, and a description of pending alternative MDTA projects which Mr. North is undertaking to obtain.
85. A memorandum of September 11,1963, from Mr. David E. Christian to the files, states:
This matter now appears to me to be in the following status. After we suspended the project for further inquiry, particularly into the labor market aspects of the matter, the State Agency reported to us (and to the Governor) that the prospects of employment for the trainees would be poor because of the surplus of applicants already existing in the area.
Subsequently, Mir. Williams, sponsor of the Wilco project, filed an order with the Employment Service for this type of help and was told that there were no *935 workers available who met the specifications. This was duly publicized and has the effect of greatly damaging the public creditability of the State Agency's labor market determination.
The Governor is in the middle on this dispute between Wilco and the State Labor Department. His office indicates a feeling that while we should not now cancel the Wilco program, we might well leave it in limbo for a period during which time every effort will be made to get final approval on the four larger projects of particular interest to the Negro community in that area.
My assessment of our status now is therefore that we should do nothing until such time as the State Government indicates formally that the labor market is such that this project should go forward. Any further inquiries from Mr. Williams or those representing him should be answered by indicating that we are awaiting such a certification from the State Agency. [Emphasis supplied.]
86. During the year between suspension and then cancellation (termination) of its contract (s), plaintiff was told several times that there was no need for its trainees in the Trenton area. The termination letter reiterated that there was no expectation of employment for the Wilco trainees.
87. In a letter dated July 30,1965, Mr. Stanley H. Rutten-berg, Manpower Administrator, acknowledged:
Under the Manpower Development and Training Act, a training program cannot be established in any area unless there is a reasonable expectation of employment and to that extent the Department erred in approving the transfer before such a determination was made by the New Jersey Employment Service. [Emphasis supplied.]
However, the results of the survey of the need for the Wilco trainees in the Trenton area by the New Jersey Employment Service was meaningless. For one thing, Willing-boro, New Jersey, is only about 15 miles from both Trenton and Camden, and equidistant between the two cities. The automobile traveling time between Willingboro and Trenton is 20-30 minutes, and a number of people commute daily between the two cities. Moreover, the New Jersey Employment Service conducted surveys for the occupational title of “Porter I.” It is quite apparent that the New Jersey agency *936 had no comprehension of the broad building maintenance program planned by Wilco (although Mr. Hunt and Dr. Wolfbein, at the Federal level, had previously shown comprehension of the program). The state employment service officials took the “Building Maintenance (Custodial) Porter” occupation from plaintiff’s Form O JT — 3, and interpreted it in a letter to plaintiff dated June 4,1964, in the following manner:
Form MDT-1, which was completed at the time of the proposal, supported a need for training in the occupation Porter I, Dictionary of Occupational Title Code No. 2-86.10 in the area served by our Burlington local office. When Form OJT-3 was prepared under Project No. NJ-J-5 the occupation was given as Building Maintenance (Custodial) Porter, Code No. 2-86.10. Form OJT-3 is titled Application for On-The-Job Training under the Manpower Development and Training Act. This form was submitted and signed by you on July 19,1963. Nowhere in our records is there any evidence that this title was ever expanded to include any greater shill than that which is contained in the Dictionary of Occupational Title definition. [Emphasis supplied.]
On July 31, 1963, this training was, at your request, transferred to Trenton. As required by law, the Trenton local office of the New Jersey State Employment Service made a survey of need for this training. The survey was conducted for the occupational title of Porter I, Code No. 2-86.10. Since, as indicated above, no other occupational title appears anywhere in our files, the survey of need for training for the title of Porter I was an appropriate one. The number of unemployed registrants in our Trenton local office at this title far exceeded any foreseeable demand.
88. The coordination between the U.S. Department of Labor and the New Jersey state agencies involved with the Wilco program was exceedingly poor and this contributed greatly to plaintiff’s confusion, and its unreasonably long involvement with a program which was eventually aborted. The following memorandum of Mr. David E. Christian, dated February 4,1964, illustrates this poor coordination, and demonstrates (in the words of the memorandum), that the state officials were “not able to adequately support the con *937 tentions upon which the suspension was 'based.” Even then, termination of plaintiff’s contract came more than 7 months after this memorandum, which recognized the basic inequity in the actions being taken on plaintiff’s contract (s).
You will recall that the subject OJT project was suspended last summer upon strong representation from Nay Male, to the effect that the project was not appropriate for several reasons. Since that time we have been awaiting the State’s conclusion with respect to this matter so that the project can either be resumed or terminated completely. The necessary information and conclusions have not been forthcoming. In the latest interchange Mr. Male promised to have these in Mr. Chapin’s hands last Wednesday; they 'have not arrived, nor has Mr. Chapin heard further from Mr. Male.
We cannot properly delay this decision much longer— both as a matter of basic equity, and because of the Congressional interest that has been expressed. Most recently we have had discussions with Senator Case’s office and have promised them a full report.
This is to request that you obtain from the appropriate New Jersey State authorities, a report and recommendation upon which we can take action. If this is not forthcoming in usable form during the next week, I will propose a decision based on the now reasonable assumption that the State is not able to adequately support the contentions upon which the suspension was based.
89. It was not until April 30,1964, that Mr. Williams was candidly and privately informed by Mr. David E. Christian “that there were factors other than employment prospects which would make it impossible to reactivate the Wilco project.” Mr. Williams maintained the allegations against him personally were “either explainable or false.” It was at that time that Mr. Christian concluded Mr. Williams would not settle peacefully, and that a formal termination notice should be sent “specifying the reasons in as strong and self-justifying a manner as possible.” (Emphasis supplied.)
90. Damages are at issue in this case and were tried by the parties. Plaintiff’s long relationship with defendant during the pendency of the above-described contráete can be divided into four periods. The first period extends from Mr. Hunt’s initial contact with Mr. Williams in November 1962 *938 until February 1, 1963, when the “CONTRACTUAL AGREEMENT,” earlier described, was signed. The parties appear to agree that costs incurred in this initial period are not reimbursable, as plaintiff spent this period educating and preparing itself to undertake such a program. The second period extends from February 1,1968 until the signing of the July 22 contract. The February 1 “CONTRACTUAL AGREEMENT” provided that defendant would pay plaintiff its reasonable and allowable costs in conformity with the project’s schedule of allowable costs. The third period extends from the signing of the July 22 contract until the “suspension” on August 15, 1963. The fourth period runs from August 15, 1963 until September 1, 1964, when the contract was “cancelled.”
91. The recordkeeping system at Wilco was, as one might expect in a small company of this type, extremely unsophisticated. Wilco did not have a regular accountant, nor a cost accounting system. Miss Wright kept records of the expenditures and the hours employees worked in a ledger. She improvised her own recordkeeping system as she had no training or experience in this field.
92. Mr. Williams testified, that many of the Wilco accounts, ledgers, receipts and invoices were destroyed by a fire at the shopping center in Willingboro in 1966. Other Wilco papers had previously been stolen from the shopping center. Mr. Williams further testified that still other Wilco records were taken in a theft in 1969 from his home in Willingboro.
93. Mr. Edward Kail, the Government auditor, limited his investigation to documents of original entry. He did not consider photostats of bills provided to him; he did not attempt to obtain verification from equipment suppliers; he did not attempt to verify the time expended by the various individuals involved in the development of plaintiff’s program with the Labor Department; he did not attempt to verify with Abney Window Cleaning Company, one of the items of alleged damages, namely, the terms and conditions of the sale of plaintiff’s accounts to that company in anticipation of the undertaking of this training program; nor did he apparently attempt to verify telephone bills through the telephone company. Mr. Kail did attempt to verify one of plain *939 tiff’s alleged prior accounts with. John’s Bargain Stores. He found Mr. Williams’ description of his business with John’s Bargain Stores to be grossly exaggerated.
94. Plaintiff alleges that it cannot supply documents of original entry because of the aforementioned fire and thefts, and it cannot be determined whether or not plaintiff ever had such documents.
95. On May 11, 1965, plaintiff presented a bill for $78,000 to the U.S. Department of Labor for “preparing and drafting N.J.-J-5 Training Program.” Plaintiff’s attorney submitted a schedule of plaintiff’s claim in this court pursuant to the commissioner’s order of October 13, 1969. He stated the “records supporting the foregoing are available in the offices of the undersigned.” Plaintiff’s claim is itemized in said schedule as follows:
Time, research and development of program_$10,000.00
Personnel_ 7,000.00
Sale of accounts_ 23,350. 00
Arrangements for equipment_ 8,190.00
Materials _ 3,500.00
Leasing _ 960. 00
Loss of ineome_ 10,000.00
Profit - 15,000.00
Total_$78,000.00
96.On February 10,1966, Wilco, through its counsel, submitted a statement of its claim to the TJSDL in the amount of $9,966.16, exclusive of settlement expenses. The schedule of costs claimed in that statement is as follows:
Rental of office space_ $300.00
Telephones_ 93.25
Materials _ 160.40
Labor and instructional salaries_ 6,656.00
Equipment rental- 1,696.00
Renovation of office facilities_ 166.00
Costs incurred by Carver YMOA_ 894.51
Total_$9,966.16
In that connection, plaintiff’s attorney wrote: “We recognize that the claim is limited to the contract amount. We are not claiming in excess of $7$60.00, even though we experienced costs and liabilities in excess thereof.” (Emphasis supplied.)
*940 97. In a subsequent letter and memorandum dated July 28, 1967, plaintiff’s attorney stated: “Wilco is entitled to reimbursement of its settlement expenses in the amount of $1,778.00, or a total reimbursement of $9,038.00.” These figures are, of course, substantially less than the $78,000 claim above-itemized, and sought in this proceeeding. No substantial proof has been offered to account for the great difference in these various totals.
98. Both the February 1 agreement and the July 22 contract contained identical schedules of proj ect costs, as follows:
A. Total estimated cost of training project- $7,280. 00
1. Job Instructional Services- 2, 700.00
Instructor Wages and Salaries Two Instructors _ 2,400.00
Other Salaries (Specify) Secretary— 300.00
2. Training Materials and Supplies- 4,085.00
Books, supplies and materials (where required)_ 175.00
Rental of books, supplies and equipment $60. per day rental_ 2, 520. 00
Other — detergents, Cleaners, floor wax, upholstery cleaner, sundry items_ 1,390. 00
3. Other Costs_ 475.00
Rental of space- 225.00
Other (Specify) Electricity, telephone & insurance_ 250. 00
99.The far larger sum sued for in this action results from, among other things, a claim of $15,000 for “profit” (although these contracts did not contemplate profit), and a claim of $23,350 for “sale of accounts.” Mr. Williams testified that after signing the February 1,1963 documents, Wilco decided to dispense with its regular accounts, except rug cleaning, and to concentrate on the training program. He testified Wilco’s main account was John’s Bargain Stores, which had 30 stores in the Philadelphia area. Other accounts were with Howard Johnson and several banks. Plaintiff introduced into evidence a copy of an agreement for the sale of the Wilco accounts to Abney Window Cleaning Company in May 1963. The space for the date in May 1963 is blank, and the copy submitted as an exhibit is not signed by the parties. Mr. Williams further testified Wilco’s regular accounts brought in $2,000 per month and that Abney Window Cleaning 'had made only the initial payment of $1,000 to Wilco *941 before defaulting on the agreement, because Abney’s poor service had caused it to lose the accounts.
100. Mr. Williams’ testimony with respect to this “sale of accounts” item, lacks support in the record. Eebuttal testimony was offered to show that Wilco would have had to clean every John’s Bargain Store in the Philadelphia area to earn what Mr. Williams said the company earned. Yet, it appears that Wilco cleaned only two or three of the John’s Bargain Stores two or three times, under an informal agreement. It is apparent that Wilco never had the resources nor the manpower to perform to the extent claimed, and that it performed only a “limited amount of business,” by Mr. Williams’ own description (see findings 22 and 23). Furthermore, nothing in the February 1 agreement required Wilco to relinquish its regular accounts.
101. Plaintiff also claims $10,000 for “loss of income.” Under this category plaintiff seeks to recover the earnings Mr. Williams allegedly would have realized had he not devoted time to the OJT program. Mr. Williams testified he was employed by the Hess Oil Company in 1963 and 1964, and was paid $100-$150 per week, plus commissions and expenses. Mr. Williams had “no idea” what his total commissions from Hess were in 1963. He testified he spent one-third of his working time during these years in work connected with the OJT program. Mr. Williams could not recall his income for any of the years in question, nor did he know how much he received from Wilco as a consultant. Mr. Williams presented no evidence to support what his “loss of income” had been, and made no showing he could have earned additional commissions had he not been working on the OJT project.
102. Plaintiff claims $960 for “leasing,” presumably the space in the Willingboro Shopping Center, as well as the space in the Carver Branch YMCA, Trenton, New Jersey. In its claim before the Labor Department, Wilco sought 6 months’ rent at the Willingboro Shopping Center, July 1, 1963 through December 31, 1963 ($300). The board allowed $225 for rental of office space, that being the amount specified in the schedule of project costs (see finding 98). The $50 *942 per month, rent claimed before that 'board is different than the rent claimed by Mr. Williams in this proceeding (see finding 46).
103. Plaintiff’s rental expense at the Carver YMCA in Trenton is also a difficult figure to ascertain. The areas to be used at Carver required no major renovations and primarily involved the rearrangement of furniture. The areas that were to be used for the O JT program were not in use on weekdays in the summer so that Carver lost no actual rental value for use of the space. During the period of plaintiff’s suspension, there is no showing that the Carver YMCA did not use the areas designated for the O JT program, for its normal purpose. Carver YMCA claims $111.25 for loss of rental from July 25 to August 19,1963. Wilco paid no rent to Carver, although there was an informal agreement drafted by Mr. Hamilton that Carver would receive $225 for each 6-week program. Carver YMCA was the initiator of the decision to transfer the Wilco program to Trenton. Mr. Hamilton and the Carver YMCA had a sincere desire to bring training to unemployed nonwhites in Trenton. The $111.25 claimed by Carver was the suggested contribution for the use of these same rooms on weekends by private groups.
104. Plaintiff also seeks the payment of telephone bills of Carver YMCA dated July 13, 1963, August 13, 1963, September 2, 1963 and September 13, 1963. Mr. Hamilton testified “99 per cent of the calls were pertaining to the program.” There is no breakdown showing how many of these calls were for regular Carver YMCA business, and how many for Wilco business.
105. Plaintiff claims $3,500 for materials. Before the aforementioned Labor Department board, Wilco claimed $160.40 for materials, and the board recommended allowance of $161. The only documentary evidence of supporting material costs are two bills for floor finish and polishing wax, totaling $95.40, from a company with an address at 4027 N. 5th Street, Philadelphia, Pennsylvania.
106. Plaintiff claims $8,190 for “arrangements for equipment.” Both the February 1 agreement and the July 22 contract provide that the cost of rental of equipment shall be *943 reimbursable. Neither agreement provides that the cost of purchase of equipment is reimbursable. The schedule of costs for the project included $60 per day for equipment rental, or $2,520 for 6 weeks. After signing the February 1 agreement, Wilco actually purchased equipment and materials. Mr. Williams testified Wilco had not been informed they would be reimbursed only for equipment rental, but an examination of the February 1 agreement indicates that purchase of equipment was not contemplated.
107. Plaintiff’s cost of equipment rental is stated to be $1,656 every 6 weeks. However, plaintiff’s exhibit is based on 24 days of rental. The record does not indicate for how many 6-week periods Wilco rented this equipment. As plaintiff’s July 22 contract was suspended only 4 days before the scheduled commencement of the training program, it was reasonable for plaintiff to have incurred the cost of equipment rental for a 6-week term.
108. On January 16,1966, the Federal Government put a lock on the Wilco office in the Tower Shopping Center in Willingboro. The Government took an inventory of equipment at that time, although such a listing is not in the record. Plaintiff kept equipment in a separate room at the shopping center until 1966 when the Government confiscated it. Mr. Williams has no idea what happened to the equipment. Mr. Williams testified Wilco held on to the equipment because of the possibility of reinstatement of the training program.
109. Plaintiff claims $10,000 for time, research and development; and $7,000 for personnel. Wilco claimed $6,560 before the aforementioned Labor Department board for “labor and instructional salaries,” and was awarded $900, that is, one-third of the $2,700 in the schedule of project costs. As in all aspects of the claim for damages in this case, plaintiff’s proof of how much time was spent on the program is scanty. The persons claiming reimbursement submitted statements stating how much work they had performed. Mr. Walter Hamilton supplemented his statement with an affidavit. Mr. Williams did not submit such a statement, but did produce two handwritten yellow pages containing his recollection *944 of part of the time he had spent on the program. The only evidence of Mrs. Williams’ time, is her testimony.
110. Mr. Williams, Mrs. Williams, and Mr. Freeman claim $10 per hour is a fair rate of compensation for their time. However, even if the training program had been completed as contemplated, the instructors for the program would have received only $5 per hour.
111. Of the $78,000 claim summarized in finding No. 95, several items must be eliminated from consideration for lack of any support in the record. These are:
A. Profit — $15,000 . . . These contracts did not contemplate a profit.
B. Sale of Accounts — $23,350 . . . See findings Nos. 99 and 100.
C.Loss of Income — $10,000 . . . See finding No. 101.
112.The following table illustrates those items as to which specific proof was addressed, and a comparison of the amount claimed for each such item in this action; and before the Labor Department’s ad hoc board:

Plaintiff Plaintiff Claims Claimed in This Before Proceeding Ad Hoc Board

Leasing (includes renovation) $960. 00 $466.00
Materials - 3, 500. 00 160.40
Arrangements for equipment-8,190.00 1,696.00
Time, research development— 10,000.00 6,656.00
Personnel_ 7,000.00 _
Telephone 93.25
Ultimate FINDINGS AND CoNcrosioNs
113.A review of the foregoing findings of fact demonstrates, it is believed, that the administration of these contracts was less than exemplary. There are numerous admissions to this effect in the record (see findings 16, 88 and 89, for example). The factual narrative, moreover, illustrates a great deal of confusion on the part of the officials charged with responsibility for success of the program (findings 57, 58, 64 and 65). Kegretfully, it also reflects obfuscation of the *945 real reasons for lengthy suspension and ultimate termination (cancellation) of the contracts (findings 77, 80, 82, 83, 84, 85. and 87).
114. All of these circumstances clearly add up to a breach of the contracts. Support for this conclusion (as well as a determination of the first date from which plaintiff was entitled to incur costs in furtherance of the program), depends upon a threshold determination of whether the February 1 agreement was in fact a contract. It had all the indicia of a contract (findings 5, 37, 38, 39, 40 and 41). From the time Mr. Hunt signed it on behalf of the Government, until the hearing on appeal of plaintiff’s claim before the ad hoc board in 1967, no one in the Labor Department ever told Mr. Hunt he was not authorized to sign it, nor that his signature was improper, nor did anyone make any effort to repudiate it (finding 42). As a matter of fact, every act which took place between the February 1 agreement and the July 22 contract was in ratification of the earlier agreement.[1] It would, moreover, have been impossible to perform the July 22 contract on schedule without all the preparatory work previously performed on the basis of the February 1 agreement.
115. Most significant is the fact that only the February 1 agreement contained anything resembling a “suspension” provision, and the Labor Department purported to “suspend” this program for over 1 year (finding 5). It had not even color of authority to do this, except under the provisions of the February 1 agreement; yet it clearly failed to comply with those provisions which speak of suspension “by the Secretary for cause if, after notice and opportunity to be heard, including an opportunity to demonstrate compliance and make restitution, a determination of failure by the OJT Facility to adhere to the requirements of the Act or to the provisions of this agreement shall be made.” On the other hand, if the “suspension” for over 1 year, purported to be under the July 22 contract, it was manifestly a breach be *946 cause that contract contained no provision or authorization for suspension.[2]
116. Finally, the ad hoc board’s characterization of the February 1 agreement is eminently sound (findings 15 and 42). It concluded that the February 1 agreement created a contractual relationship, and stated:
* * * In this connection we believe appellant’s contention (that the February document is analogous to a letter contract which was formalized by the July document) is the best interpretation of a course of dealing which does not neatly fit into any obvious legal category. Accordingly, we believe that the contractor’s claim is best considered as one arising out of the February 1, document.* * *
117. Unfortunately for plaintiff, however, its proof of damages flowing from the breach, falls short of its claim. Despite the relatively small sums involved in the February 1 agreement and July 22 contract, the record reflects that this was an important program (findings 24, 34 and 73), undertaken by qualified persons (findings 51, 52 and 55), and viewed as a pilot project with a strong likelihood of repeated renewal (finding 66). Yet this does not obviate the fact that the formalized instruments did not expressly reflect these high hopes; nor the fact that plaintiff’s proof of damages leaves much to be desired (findings 91, 92, 93, 94, 99,100 and 101).
118. Following the format in finding 112, supra, the following amounts can be amply and directly supported from the proof:
Leasing (includes renovation)--- $600.00
Materials_ 161.00
Arrangements for equipment_ 2,520. 00
Time, research development Personnel_. 2, 700.00
Telephone _ 93. 00
119.It is obvious that additional costs, not as well documented, were incurred following the February 1 agreement (findings 46, et seq., 90) and until “cancellation” on Sepltem- *947 ber 1, 1964. The cancellation, (obviously intended as a “termination,” since it cited Article 5 of the July 22 contract entitled “Termination for Convenience of OMAT”), was not effected in accordance with a standard form “Termination for Convenience” article. Eather, the provision calls for “an equitable adjustment * * * based upon the costs incurred by the Contractor up to the date the termination becomes effective.”
120. It is concluded that an “equitable adjustment” in these circumstances would be represented by payment of $7,260, the amount contemplated by the July 22 contract. This is slightly in excess of the directly supportable costs listed in finding; 118, supra; but less than the amount recoverable under a Standard “Termination for Convenience” clause[3] which would permit recovery of costs (with the contract price as a ceiling), plus settlement expense. There is insufficient proof of typically allowable settlement expense in this record to support its recovery here as part of an equitable adjustment. Moreover, plaintiff at one time acknowledged that “[w]e recognize that the claim is limited to the contract amount. We are not claiming in excess of $7,260.00 even though we experienced costs and liabilities in excess thereof.” (Finding 96.)
121. As stated by the court in Dale Constr. Co. v. United States, 168 Ct. Cl. 692, 729, 733 (1964):
It is a settled principle that where the fact of damage has been established, absolute certainty or precise mathematical accuracy as to the amount of damages is not necessary. Such damages will be allowed as in the judgment of fair men resulted from the breach. Dale Construction Co. v. United States, 161 Ct. Cl. 825, 829 (1963) ; Houston Ready-Cut House Co. v. United States 119 Ct. Cl. 120, 96 F. Supp. 629 (1951) ; Reiss & Weinsier v. United States, 126 Ct. Cl. 713, 116 F. Supp. 562 (1953) ; F. H. McGraw and Co. v. United States, 131 Ct. Cl. 501, 130 F. Supp. 394 (1955) ; First-Citizens Bank & Trust Co. v. United States, 110 Ct. Cl. 280, 76 F. Supp. 250 (1948) ; Needles v. United States, 101 Ct. Cl. 535 (1944). Certainly the defendant which “has violated (its contract should) not be permitted to reap advantage from (its) *948 own wrong . . . (and) to escape liability because of the lack of a perfect measure of the damages caused by (its) breach.” Hoffer Oil Co. v. Carpenter, 34 F.2d 589, 592 (10th Cir. 1929). * * *
* * * * ❖
* * * While it is not possible from the record to determine the exact value of the items, examination of the inventory list makes it sufficiently clear to find, on the basis of a jury verdict, that the total reasonable value of the items in question was at least $4,000 and plaintiff ■is entitled to judgment in that amount. Dee Hong Lue v. United States, 150 Ct. Cl. 655, 667, 280 F.2d 849, 856 (1960). [4]
Conclusión of Law
Based upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover the sum of seven thousand, two hundred sixty dollars ($7,260), and judgment is hereby entered for plaintiff in that amount.

 See Williams v. United States, 130 Ct. Cl. 435, 1, 27 F. Supp. 617, cert. denied, 349 U.S. 938 (1955) ; S. Silberstein & Son, Inc. v. United States, 69 Ct. Cl. 373 (1930) ; and Lamport Mfg. Co. v. United States, 65 Ct. Cl. 579 (1928).

 See United States v. Utah Constr. & Mining Co., 384 U.S. 394 (1966) ; and George H. Whike Constr. Co. v. United States, 135 Ct. Cl. 126, 140 F. Supp. 560 (1956).

 RPR 1-8.701, 1-8.702 ; 41 CPR 1-8.701, 1-8.702.

 See also WRB Corp. v. United States, 183 Ct. Cl. 409 (1968) ; J. G. Watts Constr. Co. v. United States, 174 Ct. Cl. 1, 355 F.2d 573 (1966) ; Specialty Assembling & Packing Co. v. United States, 174 Ct. Cl. 153, 355 F.24 554 (1966).